**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ted BANKS and Don Adams, Defendants-
Appellants.**

**No. 71-2923.**

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1972.

Rehearing Denied Oct. 4, 1972.

Certiorari Denied Dec. 11, 1972.
See 93 S.Ct. 568.

William Barnett, of Hanlon & Barnett, Orlando, Fla. (Court Appointed), for Banks.

William L. Eagan, of Arnold, Matheny & Eagan, P. A., Orlando, Fla. (Court Appointed), for Adams.

John L. Briggs, U. S. Atty., Kendell W. Wherry, Asst. U. S. Atty., Orlando Fla., for plaintiff-appellee.

Before TUTTLE, COLEMAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge:

Don Adams and Ted Banks appeal judgments of conviction entered against them in the United States District Court for the Middle District of Florida. The judgments are affirmed.

The prosecution was based upon an indictment in six counts.

Gurney Moody was also a defendant, but came away with a directed verdict of not guilty.

Adams and Banks were found guilty on every count in which they were named, hence this appeal.

The indictment may be summarized as follows:

Count I. Adams and Banks. Intent to defraud the United States by counterfeiting twenty dollar Federal Reserve notes, 18 U.S.C., § 471.[1]

Count II. Banks and Moody. Possession and concealment of $5,000 of the twenty dollar bills, 18 U.S.C., §§ 2 and 472.[2]

Count III. Banks and Moody. Sale, transfer, and delivery of $5,000 in counterfeit twenty dollar Federal Reserve notes, 18 U.S.C., §§ 2 and 473.[3]

Count IV. Adams and Banks. The same offense as alleged in Count II, except the amount of counterfeit notes came to $83,000.

Count V. Adams and Banks. Sale, transfer, and delivery of the $83,000 in counterfeit.

Count VI. Adams, Banks and Moody. Conspiracy to sell, transfer, and deliver counterfeit obligations, 18 U.S.C., § 371, alleging seventeen overt acts in Brevard

---

1. § 471. *Obligations or securities of United States—*

Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States, shall be fined not more than $5000 or imprisoned not more than fifteen years, or both.

2. § 2. *Principals—*

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

§ 472. *Uttering counterfeit obligations or securities—*

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possesion or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

3. § 473. *Dealing in counterfeit obligations or securities—*

Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

County, Florida, between February, 1971 and July 2, 1971.

Adams received three concurrent sentences of nine years each and a fourth concurrent sentence of five years.

Banks received five concurrent sentences of seven years each and a sixth concurrent sentence of five years.

Adams says that he is entitled to a reversal because he was improperly denied a severance, because the fruits of a search should have been suppressed, and because the trial court should have directed his acquittal.

Banks likewise attacks the validity of the search and further complains of the admission of certain testimony given by Ronald George. The final argument is that the proof did not support Banks' conviction under Count VI.

I

*The Facts*

Adams, Banks, and Moody lived at Titusville, Florida. Ronald George was a participant in the alleged criminal activities but turned government witness, was granted immunity, and became the chief witness against the defendants.

In the latter part of October, 1970, Banks purchased an offset printing press and concomitant equipment from Buddy Young. George was with Banks at the initial meeting with Young, when Banks made a downpayment on the press, and at a second meeting when they picked up the press. Adams was also present when the press was picked up. Soon afterwards, the printing press was transferred to a partitioned section of the garage at Gurney Moody's residence. Adams, Banks, and George photographed and printed 15,000 sheets, each containing three twenty dollar Federal Reserve notes. The counterfeit notes were then taken to Merritt Island Wild Life Preserve, where they were buried.

George then testified that in the middle of February, 1971, after a conversation with Adams and Banks, it was agreed to sell the counterfeit notes. George arranged five different purchases. While not charged in the indictment the first three sales were admitted into evidence on the issue of entrapment, raised by defense counsel on cross examination. The proceeds of all sales were to be evenly divided between Adams, Banks, and George.

During the second week of February, 1971, the first sale of $50,000 counterfeit notes was made on credit. Shortly thereafter, a second sale of $60,000 counterfeit notes fell through when the buyer decided not to make the purchase. On March 30, 1971, George unwittingly made a sale to an agent of the United States Secret Service and was arrested. He thereafter "co-operated" with the officers. This sale was to be an exchange of $50,000 counterfeit for $5,000 genuine. The first three sales all occurred during the time period of February 1971 to July 2, 1971, which was the period stated in Count VI of the indictment covering the conspiracy.

A fourth sale of $5,000 counterfeit for $500 genuine arranged by George took place on June 17, 1971. This sale was made with the knowledge of the United States Secret Service. The purchaser was Agent Lightsey. Adams refused to participate in this sale, but, according to George's testimony, Adams willingly received his share of the proceeds of the sale.

On June 24, 1971, George, again acting on behalf of the Secret Service, told Adams and Banks that the buyer of June 17 was interested in a larger purchase. A plan was arranged whereby the counterfeit notes (approximately $83,000) were to be placed by Adams and Banks in the purchaser's car. Adams and Banks did not know it, but the purchaser was Agent Lightsey. Then, Adams and Banks were to notify George (who was waiting in a bar with the purchaser) that the money had been deposited in the car, left on a fishing pier. George was then to collect $10,000 from the purchaser. After notifying George,

Adams and Banks were arrested within a few minutes, while sitting in a gray van, parked outside the bar. The package placed in Agent Lightsey's car was found to contain, as agreed upon, the $83,000 in counterfeit twenty dollar Federal Reserve notes. Later, these counterfeit notes were shown to be identical to the counterfeit notes received by Agent Lightsey on June 17.

Testimony by numerous Secret Service Agents corroborated George's testimony as to the plan of June 24. Agent Lightsey testified that he saw Banks notify George at the bar. Both Adams and Banks were positively identified by other Secret Service Agents as the persons who drove numerous times by the pier in a gray van. These agents further identified the gray van as having pulled alongside Agent Lightsey's car, whereupon Banks was observed getting out of the van, opening the right front door of Agent Lightsey's car, and leaning over into it. After Adams and Banks left in the gray van, the Secret Service Agents located the package which had been placed on the floor of Lightsey's car. Five minutes later, Agent Lightsey arrived, opened the package, and found the $83,000 in counterfeit twenty dollar Federal Reserve notes. An expert witness for the government identified sand from these counterfeit notes as being identical to sand found on a shovel in the gray van when Adams and Banks were arrested.

Adams testified that he drove Banks on the night of June 24 to both the place where the notes were buried and where Agent Lightsey's car was located on the pier.

On July 2, 1971, before a United States Magistrate, a Special Agent of the United States Secret Service, made an affidavit for a warrant to search the residence located at 3224 Virginia Drive, Titusville, Florida, [belonging to Gurney Moody] for an electrically operated offset printing press and related equipment used in the production of counterfeit $20.00 Federal Reserve notes.

As probable cause for the issuance of the warrant, the affidavit averred:

"John Wade Moody was arrested for possession of counterfeit money on May 21, 1971, and subsequently interviewed at which time he stated that he had gotten the counterfeit money from his brother, Guerney Moody, who told John Wade Moody that the printing plant for the counterfeits was in Titusville, Florida. Guerney Moody was arrested by Secret Service Agents from Cincinnati, Ohio, and charged with violation of Federal law involving counterfeit obligations of the United States.

"Investigation has determined that Guerney Moody was living at 3224 Virginia Drive, Titusville, Brevard County, Florida, prior to May 21, 1971, and has continuously resided there up to and including the date of this Affidavit. Investigation by the Secret Service has developed that additional electric service wiring has been installed in the garage of the aforesaid premises, said additional wiring being suitable for the operation of printing equipment.

"In the last 90 days the United States Secret Service has seized approximately $150,000 worth of counterfeit obligations in Brevard County, Florida, which are identical to those counterfeit obligations seized from John Wade Moody in Ohio, and it is believed that said counterfeit obligations were manufactured with equipment at the aforesaid premises on Virginia Drive, Titusville, Florida."

The warrant was issued and served. The search produced the offset printing press and associated equipment.

As already stated, the appellants vigorously attack the validity of the warrant.

## II

### The Law

■ We are of the opinion that Adams had no standing as an aggrieved

person under Federal Rules of Criminal Procedure 41(e) to challenge the search and the evidence gathered, since he did not have sufficient proprietary interest in the premises or possessory interest in the seized property, Lurie v. Oberhauser, 9 Cir., 1970, 431 F.2d 330, 333; United States v. Goad, 10 Cir., 1970, 426 F.2d 86; United States v. Graham, 6 Cir., 1968, 391 F.2d 439, cert. denied 393 U.S. 941, 89 S.Ct. 307, 21 L.Ed.2d 278; Richardson v. United States, 5 Cir., 1966, 360 F.2d 366; United States v. Wolfson, D.C.Del., 1969, 299 F.Supp. 1246; cf. Mancusi v. De Forte, 392 U.S. 364, 367–368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Adams did not purchase the printing press, did not own the premises where the search was conducted, and was not present when the search was conducted. We similarly concluded in Granza v. United States, 5 Cir., 1967, 377 F.2d 746, 749 rehearing denied 381 F.2d 190, cert. denied 389 U.S. 939, 88 S.Ct. 291, 19 L.Ed.2d 292, that the appellants there had no standing because they had no interest in the premises nor were they present at the time of the search.

■ Adams does not come within the general principle laid down in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960) that anyone legitimately on the premises where a search occurs may challenge the legality of the search by way of a motion to suppress when the fruits of the search are proposed to be used against him. Nor does Adams come within the second principle of standing decided in *Jones* that a defendant need not comply with the conventional requirements of standing by showing either an interest in the premises searched or an interest in the incriminating property seized when he is charged with an offense which may be established solely through proof of possession. The rationale for this conclusion is that if the defendant's conviction flows from possession (as in *Jones* of narcotics), it would be inconceivable to hold that the fruits of the search upon which the conviction depends were admitted into evidence on the ground that the petitioner did not have possession at that time, Jones v. United States, *supra*, 362 U.S. at 263, 80 S.Ct. 725, 4 L.Ed.2d 697; cf. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247.

■ Finally, Adams does not gain standing, because the search was directed [4] at a person charged with the same crime or allegedly connected with the same crime who would himself have standing to object, United States v. Graham, *supra*, 391 F.2d at 444; Diaz-Rosendo v. United States, 9 Cir., 1966, 357 F.2d 124, cert. denied 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83. In Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the rule was affirmed "that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence", and furthermore, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted," *Id.* at 171, 89 S.Ct. at 965.[5]

---

4. In Jones v. United States, *supra*, the Supreme Court stated: "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else."

5. Alderman v. United States, *supra*, involved the issue whether petitioners there could assert an independent constitutional right of their own to exclude relevant and probative evidence because it was seized from another in violation of the Fourth Amendment. We do not face that problem here since we hold *infra* that the search warrant was supported by probable cause. However, we think it is

Banks, of course, has standing to assert that the search warrant was not grounded upon a legally sufficient affidavit, that is, that the affidavit did not show probable cause for the issuance of the warrant. Banks owned the seized equipment. We are of the opinion that the affidavit was sufficient. That applies to Adams' attack (as well as Banks') if, indeed, Adams did have the necessary standing.

### A. The Affidavit for the Search Warrant

The appellants say that because it was based on hearsay the affidavit supporting the search warrant was fatally defective; that is, John Wade Moody's statement as to the location of the printing press was based on what he had been told by his brother, Gurney Moody.

Furthermore, it is argued that the affidavit amounted to "hearsay upon hearsay" because the affiant based his statements on what John Wade Moody had reported.

The number of reported Fourth Amendment "probable cause" cases is legion, but we think the correct answer to these arguments is to be found in the decisions of the Supreme Court in United States v. Harris, 403 U.S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971) and Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

These cases teach that to show probable cause an affidavit for a search warrant may be grounded upon hearsay if the affidavit also contains averments which reflect a substantial, underlying basis for crediting the hearsay.

In his dissenting opinion in Harris, supra, the late Mr. Justice Harlan stated, 403 U.S. at 587, 91 S.Ct. at 2083:

"Where, as in this case, the affiant states under oath that he has been informed of the existence of certain criminal activity, but has not observed that activity himself, a magistrate in discharging his duty to make an independent assessment of probable cause can properly issue a search warrant only if he concluded that: (a) the knowledge attributed to the informant, if true, would be sufficient to establish probable cause; (b) the affiant is likely relating truthfully what the informer said; (c) it is reasonably likely that the informer's description of criminal behavior accurately reflects reality."

Without reference to the language in the various opinions written in connection with the Judgment of the Supreme Court in Harris, we think the affidavit presently before us clearly met the requirements which even Mr. Justice Harlan would have imposed:

(1). On May 21, 1971, at a point several hundred miles from Titusville, Florida, John Wade Moody was apprehended in the possession of counterfeit money;

(2). This counterfeit money was identical to $150,000 worth of counterfeit obligations seized in Brevard County, Florida, within the ninety days immediately preceding the execution of the affidavit;

(3). Human experience teaches that a man is not likely to falsely implicate his own brother in a serious felony or to reveal his admissions of guilt;

(4). It was highly unlikely that some of the huge sum of counterfeit twenty dollar bills so closely held in Brevard County, Florida, would so quickly find its way to Cincinnati, Ohio, except between people well acquainted with or possibly kin to one another;

(5). While under ordinary circumstances "additional electric service wiring to a garage" would not have been evidentiarily significant, the officers and the magistrate were not compelled to consider this fact in isolation from the other facts set forth in the affidavit.

worth noting what the Court did say in Alderman: "Of course, Congress or state legislatures may extend the exclusionary rule and provide that illegally seized evidence is inadmissible against anyone for any purpose." Id. 394 U.S. at 175, 89 S.Ct. at 967.

The process of counterfeiting money, as a matter of common knowledge, requires highly sensitive photographic equipment and an offset press with which to duplicate the resulting plates.

Therefore, there were substantial underlying facts justifying the conclusion of the magistrate that the statement of John Wade Moody pointed with probable cause to the true location of the offset press; that John Wade Moody had told the truth as to the admissions of Gurney Moody; that the Secret Service Agent most likely was relating truthfully that which John Wade Moody had reported; and the other facts as to the seizure of counterfeit twenty dollar bills in Brevard County helped supply the reasonable probability that the affidavit presented information "which reflected reality".

We are of the opinion that the magistrate tested and interpreted the affidavit in a common sense and realistic fashion, United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). See, also, our recent decision in United States v. Melancon, 5 Cir., 1972, 462 F.2d 82.

In reaching these conclusions we are mindful of the language of the Supreme Court in Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L. Ed.2d 637 (1969):

> ". . . that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062 [18 L.Ed.2d 62] (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 745 [13 L.Ed.2d 684] (1965); and

that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U.S. 257, 270–271, 80 S.Ct. 725, 735–736 [4 L.Ed.2d 697] (1960)."

In addition, we heed the admonition of the Court in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

> "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." Id. at 175, 69 S.Ct. at 1310.

## B. *The Denial of Severance*

Appellant Adams sought severance under Rule 14, Federal Rules of Criminal Procedure on the basis that each count of the indictment did not charge each defendant and that each count of the indictment alleged isolated incidents involving different persons at different times. Defendants may be joined in trial if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses", Federal Rules of Criminal Procedure 8(b). Proof of a conspiracy count will validate a joinder of substantive offenses growing out of that conspiracy, United States v. Spector, 7 Cir., 1963, 326 F.2d 345, 350. See, also, Schaffer v. United States, 362 U.S. 511, 517, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960) and United States v. Varelli, 7 Cir., 1969, 407 F.2d 735, 745. Since ample proof supported the conspiracy count against Adams and Banks, and the statute allegedly violated in the conspiracy count was one of the same statutes allegedly violated in one of the individual counts, joinder was proper under Rule 8(b), United States v. Spector, *supra,* 326 F.2d at 351. Once the conditions of Rule 8(b) are satisfied, it is then "within the sound discretion of the trial judge as to whether the defendants should be

tried together or severally", Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954). We find that such discretion was not abused here since the "factual and legal compactness of the consolidated trial" outweighed any potential prejudice to Adams, United States v. Harris, 5 Cir., 1972, 458 F.2d 670, 673. See also, Flores v. United States, 5 Cir., 1967, 379 F.2d 905.

### C. *The Claim of Surprise*

Appellant Banks claims prejudicial surprise because the goverment's witness, Ronald George, testified to sales of counterfeit obligations other than those counterfeit obligations which were the subject matter of the counts of the indictment. This contention has no merit. First, evidence of prior similar acts is admissible to show intent, preparation, or plans relating to a charge of conspiracy, United States v. Bullock, 5 Cir., 1971, 451 F.2d 884, 889; United States v. Ayres, 5 Cir., 1970, 434 F.2d 60, 62, cert. denied Sidney v. United States, 401 U.S. 938, 91 S.Ct. 930, 28 L. Ed.2d 217; Reese v. United States, 5 Cir., 1965, 353 F.2d 732, 734. Second, evidence of prior similar conduct is admissible to show a common scheme, plan, design, or intent, Koran v. United States, 5 Cir., 1969, 408 F.2d 1321, 1324–1325, cert. denied 402 U.S. 948, 91 S.Ct. 1603, 29 L.Ed.2d 118.

### D. *Count VI*

Banks also contends that Count VI of the indictment covering the alleged conspiracy fails for lack of proof because one of the alleged co-conspirators, Gurney Moody, was granted a judgment of acquittal. Conviction of *two or more* alleged conspirators is not affected by the fact that trial of some other defendant did not result in conviction, Robinson v. United States, 5 Cir. 1964, 333 F.2d 950, 951, cert. denied 379 U.S. 921, 85 S.Ct. 277, 13 L.Ed.2d 335. See, Annot., 91 A.L.R.2d 700, 713 (1963).

### E. *The Sufficiency of the Evidence*

Finally, appellant Adams argues that there was not sufficient evidence to support his conviction under all counts of the indictment on which he was charged. The recitation of the evidence in the beginning of this opinion necessitates the rejection of this contention, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

The convictions of the appellants are in all respects

Affirmed.