UNITED STATES of America,
Plaintiff-Appellee,

v.

Sidney LEVINE and MPD Film Productions, Inc., Defendants-Appellants.

No. 76–1543.

United States Court of Appeals,
Fifth Circuit.

Feb. 7, 1977.
Rehearing Denied May 2, 1977.
See 551 F.2d 687.

Joel Hirschhorn, Miami, Fla., Ralph J. Schwarz, Jr., New York City, Herald Price Fahringer, Buffalo, N. Y., for defendants-appellants.

Robert W. Rust, U. S. Atty., J. Daniel Ennis, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Defendants, Sidney Levine and MPD Film Productions, Inc. (MPD), appeal from judgments of conviction and sentences entered by the district court for conspiracy and interstate shipment of obscene films. Because the indictment charged separate, distinct, and unrelated offenses by different defendants in contravention of Federal Rule of Criminal Procedure 8(b), we reverse and remand for a new trial. Since the cause must be tried again, we also reach and decide other assignments of error likely to recur.

In Count I of a five-count indictment, returned against Charles Solomon Abrams, Emile Alan Harvard, Sidney Levine, Raphael Jesus Remy, Cinecraft Industries Corp. (Cinecraft), MPD, and Pictograph Corporation (Pictograph), a United States Grand Jury charged all indictees with conspiracy under 18 U.S.C. § 371 (1970) to commit the substantive offenses alleged in the indictment. Counts II and III charged Abrams, Harvard, Remy, and Pictograph with interstate transportation of obscene film by common carrier under 18 U.S.C. § 1462 (1970) and interstate transportation of obscene film for sale and distribution under 18 U.S.C. § 1465 (1970). Counts IV and V charged Harvard, Levine, Remy, Pictograph, and MPD with these same substantive offenses.

Before the jury trial of Abrams, Levine, and MPD commenced, the charges against Cinecraft and Pictograph were dismissed. Remy and Harvard pled guilty to the conspiracy count. The district court entered a judgment of acquittal as to Abrams at the close of the government's case; the jury returned verdicts of guilty on all three counts against Levine and MPD.

Rule 8 of the Federal Rules of Criminal Procedure governs joinder of offenses and of defendants in a single indictment. A claim of misjoinder under the rule is reviewable on appeal as a question of law. *United States v. Park,* 531 F.2d 754, 760 (5th Cir. 1976); *accord, United States v. Marionneaux,* 514 F.2d 1244, 1248 (5th Cir. 1975); *Tillman v. United States,* 406 F.2d 930, 933 n. 5 (5th Cir.), *vacated and remanded in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Joinder of offenses or defendants requires a balancing of the right of an accused to a fair trial and the public's interest in the efficacious administration of justice. *United States v. Gentile,* 495 F.2d 626, 630 (5th Cir. 1974). We have described rule 8 as an " 'attempt to set the limits of tolerance,' " for this process. *United States v. Bova,* 493 F.2d 33, 36 (5th Cir. 1974), *quoting, King v. United States,* 355 F.2d 700, 703 (1st Cir. 1966). Accordingly, misjoinder under the rule is prejudicial *per se* ; if the limits of the rule are exceeded, a grant of severance is mandatory. *United States v. Marionneaux,* 514 F.2d at 1248; *United States v. Bova,* 493 F.2d at 35–36.

Subdivision (a) of rule 8 applies when a single defendant is charged with multiple offenses. Our concern here is with the requirements of subdivision (b), which governs cases involving multiple defendants. *United States v. Park,* 531 F.2d at 760 n.4; *United States v. Marionneaux,* 514 F.2d at 1248–49; *United States v. Gentile,* 495 F.2d at 628 n. 2; *United States v. Bova,* 493 F.2d at 35. Rule 8(b) provides:

> *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may

be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

In *United States v. Marionneaux,* 514 F.2d at 1248–49, we defined the phrase "the same series of acts or transactions" as requiring a "substantial identity of facts or participants" between two offenses to make rule 8(b) joinder proper.

■ If Counts II and III had been the only counts charged in the indictment, their joinder would have been proper. The same would hold true if Counts IV and V had been the only counts charged. Since the same persons were charged in each pair of counts, substantial identity would exist among the alleged participants. Much of the evidence offered to prove the section 1462 offense would go to establish the section 1465 offense. Consolidating such charges against more than one defendant under rule 8(b) facilitates prosecution by requiring the government to prove its case only once. *United States v. Gentile,* 495 F.2d at 630. Of course the possibility exists that evidence introduced to prove one count in an indictment will spill over and taint the case on another count. A jury might intertwine the evidence and thereby improperly lessen a defendant's prospects of being acquitted as to a joint count. Submission of proper, limiting instructions to the jury, accompanied by a strict charge as to what testimony it may and may not consider, and the continuing obligation of a trial court to grant a severance under rule 14 of the Federal Rules of Criminal Procedure if prejudice to any defendant appears, are considered to be adequate safeguards against these prospects. *Schaffer v. United States,* 362 U.S. 511, 515–16, 80 S.Ct. 945, 947–48, 4 L.Ed.2d 921 (1960). Although "some prejudice almost necessarily results . . . when several defendants are jointly charged with a single offense or related offenses," *Cupo v. United States,* 123 U.S.App.D.C. 324, 359 F.2d 990, 993 (1966), *cert. denied,* 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967), the presumptive benefits to the public as the result of the rule 8(b) joinder are thought to outweigh the possibility of prejudice accruing to the several defendants. *United States v. Bova,* 493 F.2d at 36–37.

■ Counts II, III, IV, and V could not have been charged in a single indictment, however, because the requisite substantial identity of facts or participants necessary for proper rule 8(b) joinder would no longer be present. The sole connection between the offenses charged in Counts II and III and the offenses charged in Counts IV and V are: (1) their mutual identity and (2) the presence of Harvard, Remy, and Pictograph. Otherwise Counts II and III on the one hand and Counts IV and V on the other arise from different factual matrices, implicating different defendants at different times. *United States v. Gentile,* 495 F.2d at 630–31; *Compare United States v. Strand,* 517 F.2d 711, 713–14 (5th Cir.), *cert. denied,* 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373 (1975), *with United States v. Marionneaux,* 514 F.2d at 1248–49.

When unrelated transactions involving several defendants are joined together, "'[i]t cannot be said . . . that all the defendants [would not be] . . . embarrassed and prejudiced in their defense, or that the attention of the jury may not have been distracted to their injury in passing upon the distinct and independent transactions." *United States v. Bova,* 493 F.2d 36, *quoting McElroy v. United States,* 164 U.S. 76, 81, 17 S.Ct. 31, 33, 41 L.Ed. 355 (1896). Especially when, as here, the nexus between the separate groups is the defendants common to each and a mutual identity of the counts charged, the transference of guilt from one group of defendants to the other is inexorable. The result is an inherent prejudice that no form of limiting instructions or cautionary charge could absolve, and joinder of the four counts would be improper. Indeed, the government has not attempted to establish that a bridge sufficient to satisfy rule 8(b) joinder existed between the defendants who went to trial as the result of these four counts.

Rather, the government relies on Count I, containing a ubiquitous conspiracy charge, to provide a common link between these

otherwise unrelated transactions and to demonstrate the existence of a common scheme or plan among the several defendants. *See United States v. Banks,* 465 F.2d 1235, 1242–43 (5th Cir.), *cert. denied,* 409 U.S. 1062, 93 S.Ct. 568, 34 L.Ed.2d 514 (1972). The wording of the count is apt to describe a "wheel conspiracy" in which Harvard at the hub of the wheel might have conspired with Abrams, Levine, and others representing different spokes, in separate transactions to commit the substantive obscenity offenses charged.

■ For a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. *Blumenthal v. United States,* 332 U.S. 589, 556–57, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947). Otherwise the conspiracy lacks "the rim of the wheel to enclose the spokes." *Kotteakos v. United States,* 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the "wheel" is incomplete, and two conspiracies rather than one are charged.

■ In the absence of an argument of prosecutorial bad faith, *United States v. Nims,* 524 F.2d 123, 126 (5th Cir. 1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976), allegations of an indictment will be accepted as true in deciding a rule 8(b) motion. The motion cannot be used as a device to force the government to prove its case prematurely, *see Schaffer v. United States,* 362 U.S. at 522, 80 S.Ct. at 951 (Douglas, J., dissenting). Where, however, the defendant can show that the charge of a joinder of defendants in conspiratorial action is based on a legal interpretation that is improper, the court cannot base its 8(b) ruling on the written words alone but must determine if, under correct legal theory, joint action was actually involved. *See United States v. McDaniels,* 57 F.R.D. 171, 174 (E.D.La.1972). *See also* 8 R. Cipes: *Moore's Federal Practice* ¶ 8.06[3]; at 8–41 (2d ed. 1976).

Applying these rules to the allegations of the indictment in the case at bar, we look first to see what the words used attempted to describe by retelling what the government knew when it drew the indictment. Harvard, who had been in the motion picture industry for 38 years, and Abrams, who was in show business, agreed that Harvard would make a 35 millimeter film entitled "Valley of the Nymphs" (Nymphs) so that Abrams could promote the career of a Puerto Rican female dancer. Harvard directed and produced an initial version of Nymphs in May of 1972. After finding that this version would not serve his purposes, Abrams came back to Harvard in August, 1972, with a request to remake the film into one containing explicit sex scenes. Harvard shot additional film footage containing such scenes and spliced the new material into the negative of the original. Abrams accepted this revised version and subsequently made an agreement with Harvard whereby Abrams would finance the film and Harvard would be compensated from a percentage of the movie's profits.

During this same period of time, Harvard met separately with Levine to discuss the production by Harvard of 16 millimeter simulated sex films for sale and distribution by Levine. Levine later asked Harvard to change the format of these movies from simulated to explicit sex because the market demanded "stronger" movies. Harvard subsequently produced 18 of these films for Levine. Harvard prepared trailer writeups and scripts for these movies. He was in charge of initial shooting and was the director and producer. Levine was often present during shooting, however, and would sometimes advise how he wanted particular episodes to be shot. Levine paid Harvard a fixed sum for each of these films, though the amount agreed upon varied from film to film.

The same actors usually appeared in Levine's films. Some of these actors also appeared in Abram's Nymphs. The same processing laboratory in New York and the same sound studio in Miami worked on Nymphs and those films produced for Le-

vine. Levine did not know Abrams or vice versa. Levine had no financial or other interest in Nymphs, and Abrams had no sort of interest in any of the films produced for Levine.

Count I of the indictment charges that from about April 11, 1972, and continuously through February, 1973, in Dade County, Florida, Abrams, Harvard, Levine, Remy, Cinecraft, MPD, and Pictograph willfully and knowingly conspired to commit the substantive offenses under 18 U.S.C. §§ 1462, 1465 (1970). The count sets forth 21 overt acts as allegedly being performed by the indictees in furtherance of the conspiracy. Overt acts 1, 2, 3, and 13 are concerned solely with transactions among Abrams, Harvard, and Remy in producing "Nymphs." Overt acts 4, 5, 6, 7, 8, 9, 11, 12, 14, 18, 19, and 20 are concerned solely with transactions among Harvard, Levine, Remy, and MPD while making Levine's 16 millimeter films. Only overt act 10 mentions Abrams, Harvard, and Levine together. It avers that "[o]n or about December 11, 1972 in Dade County . . . [they] contacted Radiant Laboratories, Inc., . . . with regard to photographic processing of a 35 millimeter film entitled 'Valley of the Nymphs.' "

Levine moved in advance of trial to dismiss or to sever on the ground that Count I pleaded two separate and distinct conspiracies in violation of rule 8(b). A United States Magistrate denied the motion without prejudice to renew it at the trial. The motions were renewed at the close of trial.

On appeal defendants Levine and MPD do not contend that the government acted in bad faith when drawing up the indictment. Though they dispute that the government ever knew a fact or inference which would support the assertion of joint action in overt act 10, they urge that this one overt act is insufficient to permit the joiner of what was two different conspiracies and should be properly disregarded in testing the indictment's validity for rule 8(b) purposes. Thus, our inquiry is limited to whether or not the conspiracy count as it stands was sufficient to satisfy rule 8(b)'s requirement that the defendants "have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *Schaffer v. United States*, 362 U.S. at 515, 80 S.Ct. at 947; *see United States v. Cruz*, 478 F.2d 408, 414 (5th Cir.), *cert. denied sub nom., Aleman v. United States*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973); *United States v. Banks*, 465 F.2d at 1242; *Tillman v. United States*, 406 F.2d at 934.

Defendants argue that if the indictment is read in a common sense fashion it is clear that no agreement or conspiracy among Abrams, Harvard, and Levine ever existed. They argue that Count I intended to and does allege facts which, in law, comprise two different conspiracies involving two completely unconnected transactions and that this total separation is confirmed by the substantive counts charged. They urge that even if overt act 10 is considered accurate, it does not satisfy the *Marionneaux* standard that there be a substantial identity of facts or participants in the same series of transactions to permit rule 8(b) joinder because it is too thin a thread to support the assertion that only one conspiracy is alleged.

In replying to the defendants' arguments, the government argues that our decision in *United States v. Gentile*, 495 F.2d at 631–32, establishes the principle that if a conspiracy is to tie separate series of transactions together so as to permit proper joinder of defendants, the sole requirement is that the substantive offenses alleged in the indictment fall within the scope of the conspiracy. *Citing Schaffer v. United States, supra*, and *United States v. Cruz, supra*, the government insists that the joinder was proper because the conspiracy count tied the defendants together on the face of the pleadings. It urges that the indictment conclusively demonstrates that the substantive offenses were inextricably woven into the conspiracy count due to the nature of the offenses, their close proximity in time and place, and the presence of common elements leading to their commission. It takes this position even while admitting in

brief and at oral argument that no documentary or direct evidence ever existed to show that Abrams and Levine had any contact whatsoever with each other's films or were aware or should have been aware of each other's films or were aware or should have been aware of each other's activities during the period the alleged conspiracy took place.

Other than overt act 10, no facts are alleged that could support the conclusion that Abrams and Levine were ever cognizant of each other during the alleged conspiracy. Indeed upon comparing the conspiracy count and its overt acts with the substantive counts, one can only conclude that the insertion of Levine's name in connection with Abrams and the production of "Nymphs" in overt act 10 was the result of inadvertence on the government's part. This is especially borne out by comparing overt acts 10 and 13. The language of the two is identical except that Levine's name is omitted in overt act 13 which took place at a later date. The government conceded at oral argument that both overt acts were charged solely upon invoice receipts, now in evidence, containing identical information that were mailed for the film processor in New York to Harvard in Miami. Nothing is present in these receipts upon which one could reasonably conclude that Levine was connected with Abrams or the production of Nymphs in any way.

Furthermore, we agree with defendants that even assuming Levine properly appears in overt act 10, this is insufficient to satisfy *United States v. Marionneaux*, 514 F.2d at 1248–49. The presence of one allegation that Abrams, Harvard, and Levine acted together in placing one telephone call among 20 other overt acts which point overwhelmingly to the existence of two unrelated conspiracies to distribute obscene films, is too tenuous to support the substantial identity of facts or participants necessary and justify rule 8(b) joinder.

The only real underpinning for the government's conspiracy count was the false legal premise that proof of proximate or simultaneous conspiracies with one common conspirator was sufficient to establish the existence of a single conspiracy. The government points out that both Abrams' 36 millimeter Nymphs and Levine's 16 millimeter films were produced by Harvard who used the same actors in the films' explicit sex scenes, were processed by Radiant Laboratories in New York, and were dubbed with sound by Warren Sound Studios in Miami, all of which took place at approximately the same time and in the same cities. The government argues that these facts establish that Abrams and Levine *had* to have conspired together.

This is simply not so. Harvard was in the business of making films. That Harvard's agreement to make and distribute an illicit film with Abrams was altogether separate from the combination he formed with Levine to film a series of pornographic episodes was confirmed by Abrams' judgment of acquittal at the close of the government's case and the district judge's action in having Nymphs excluded from the proof on the conspiracy count. "Thieves who dispose of their loot to a single receiver—a single 'fence'—do not by that fact alone become confederates: they may, but it takes *more* than knowledge that he is a 'fence' to make them such." *United States v. Lekacos*, 151 F.2d 170, 173 (2d Cir. 1945), *quoted with approval in Kotteakos v. United States*, 328 U.S. at 755, 66 S.Ct. at 1243. It must be shown that each knew or must have known of their confederates and that they acted in the furtherance of a common plan. *Blumenthal v. United States*, 332 U.S. at 556–57, 68 S.Ct. at 258–57.

The government's reliance upon *Schaffer v. United States, supra, United States v. Gentile, supra*; and *United States v. Cruz, supra*, is misplaced. In none of these cases was it argued, as here, that proximate or simultaneous conspiracies had been alleged on the face of the conspiracy count to prove a single conspiracy. In each instance the conspiracy count before the court was held to allege a series of acts or transactions which were sufficiently connected to satisfy rule 8(b) joinder. In the instant case, since allegations of proximate conspiracies are

legally insufficient to establish a single overall conspiracy, the conspiracy count could not "reasonably have been made." *United States v. McDaniels,* 57 F.R.D. at 174. "Numbers are vitally important in trial, especially in criminal matters. Guilt with us remains individual and personal, even as respects conspiracies." *Kotteakos v. United States,* 328 U.S. at 772, 66 S.Ct. at 1252.

In the case at bar no substantial identity of facts or participants as is necessary to satisfy rule 8(b) exists between these alleged conspiracies. *Compare United States v. Marionneaux,* 514 F.2d at 1248–49 *and United States v. Bova,* 493 F.2d at 36–37, *with United States v. Gentile,* 495 F.2d at 630–32, *and Kivette v. United States,* 230 F.2d 749, 753 (5th Cir. 1956), *cert. denied,* 355 U.S. 935, 78 S.Ct. 419, 2 L.Ed.2d 418 (1958). The indictment as drawn contravenes rule 8(b) joinder. Our holding requires that their judgment of conviction and sentences be vacated and remanded for further proceedings.

Defendants have also raised a number of issues presenting matters likely to recur at retrial. In the interest of judicial economy, we reach and rule on those issues now. Counts IV and V charged defendants Levine and MPD and others, with interstate shipment from Dade County, Florida to New York City of "Ball and Chain," one of the 16 millimeter films produced by Harvard. The United States Magistrate granted Levine's pretrial motion for discovery of particulars of time and place as to this charge. The government complied by asserting that the substantive counts show that "the films were shipped from New York, but more specifically from Radiant Laboratories to (Harvard's corporations at) 12338 North Miami Avenue, Miami, Florida." At trial, Harvard testified that "Ball and Chain" was made for Levine and approved by him and that Harvard had formed a fictitious company called Flagler Sound at Levine's behest so that shipments of the 16 millimeter films could continue from Florida to New York without Harvard's name or his corporations being asso-

ciated with them. Trial testimony and documentary evidence also established that after processing, these films were shipped by Radiant from New York to Florida. Defendants objected to the introduction of this proof on the grounds that the government's response to its discovery motion and the proof that the film was shipped both ways constituted a "material and substantial change from the indictment."

On appeal defendants contend that the government's response to their discovery motion constituted an improper "bill of particulars addition" to Counts IV and V, which allowed proof that the film was shipped both ways and created a material variance from the indictment. They also argue that defendant Levine did not ship any obscene film from Florida to New York because the only thing shipped from Florida to New York were the initial negatives for processing and not the final film.

 Assuming without deciding that a discovery motion under Federal Rule of Criminal Procedure 16 will be treated as a motion for a bill of particulars under rule 7, no error was created in the instant case. The indictment clearly states that "Ball and Chain" was shipped from Florida to New York. The purpose of a bill of particulars is not to supplement or in any wise change or affect the indictment as an indictment. It is to apprise the defendant of what proof he is expected to meet. *United States v. Martinez,* 466 F.2d 679, 686 (5th Cir. 1972); *Pipkin v. United States,* 243 F.2d 491, 494 (5th Cir. 1957). The government's response to the defendant's discovery motion indicated that it would attempt to prove that "Ball and Chain" was shipped from Florida to New York circumstantially. From proof that after processing, "Ball and Chain" had been shipped by Radiant from New York to Florida back to Harvard, a jury could certainly infer that Harvard had shipped the initial negatives of the same film from Florida to New York. Moreover, as shown above, direct evidence was adduced at trial establishing the shipment of the film from Florida to New York via a fictitious compa-

ny formed at Levine's request with reshipment from New York to Florida.

Defendants were well apprised of the charge against which they would have to defend and suffered no prejudice to their defense as a result of the government's response. *See United States v. Martinez,* 466 F.2d at 686. We also note that that proof fully warranted the trial court's action in instructing the jury as to aiding and abetting. The evidence adduced at trial was sufficient to establish defendants' connection with the shipment of the films from Florida to New York and to support their judgment of conviction. *See United States v. Young,* 527 F.2d 1334, 1336 (5th Cir. 1976); *United States v. Bullock,* 451 F.2d 884, 888 (5th Cir. 1971); *United States v. Gower,* 447 F.2d 187, 192–93 (5th Cir.), *cert. denied,* 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 88 (1971); *Pereira v. United States,* 202 F.2d 830, 836–37 (5th Cir. 1953), *aff'd,* 347 U.S. 1, 10–11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954). The argument that the initial negative material of the final version of "Ball and Chain" shipped from Florida to New York for processing into dailies by Radiant does not constitute film is eristic sophistry. The statutes alleged to have been violated proscribe shipment of such materials whether finally processed or not. *See Spillman v. United States,* 413 F.2d 527, 530 (9th Cir.), *cert. denied,* 396 U.S. 930, 90 S.Ct. 265, 24 L.Ed.2d 228 (1969); *United States v. Peller,* 170 F.2d 1006 (2d Cir. 1948).

To understand the evidentiary objections raised by defendants, a brief explication of the film-making process proof introduced in this case is necessary. Upon shooting a 16 millimeter film for Levine, Harvard would ship the initial negative material to Radiant in New York for processing. This footage was processed and developed by Radiant into footage called "dailies." Radiant returned the dailies to Harvard who cut, edited, and prepared what is called the "cut negative." Music and sound were then synchronized with the scenes in the cut negative and applied to the film. The resulting product is called a "work print." Harvard then shipped the work print of each film to Radiant for the making of what is called the "answer print." In New York, Levine would approve the answer print from which "release prints" were made for distribution of the final version of the film.

After a release print of "Ball and Chain" was exhibited to the jury in November, 1975, Harvard was asked whether he could testify that the scenes from the release print were identical to those contained in the work print he had shipped to Radiant in November, 1972. Although he admitted that it would be impossible for him to establish the two as identical in every respect, Harvard stated that he knew it was the film he had made in November, 1972. He knew this from the film's title, credits, participants, props, and the fact that each of his films made for Levine had a joke or gag which served as the film's "story." The telling of the joke comprised 10 percent of the action with the remainder being explicit sex. A special agent of the FBI testified that he saw "Ball and Chain" in December, 1972 and that the film shown in the courtroom in November, 1975 was the same. At trial, defendants objected to the authentication of "Ball and Chain" as violating the best evidence rule. The objection was overruled.

Defendants now argue that since Counts IV and V charged shipment of the "Ball and Chain" work print from Florida to New York in November, 1972, admission and viewing a release print of the film violated the best evidence rule. They argue that the best evidence that the 1972 work print is obscene is the work print itself. They contend that the government's failure to account for not introducing the 1972 work print precluded the introduction of the release print of "Ball and Chain" which is merely secondary evidence. Finally, they argue that assuming the government is excused for some reason from having to produce the 1972 work print, the release print of "Ball and Chain" was not properly authenticated.

As defendants' trial began after the effective date of the Federal Rules of Evi-

dence and no party has argued that "application of the rules would not be feasible, or would work injustice . . .," the rules were properly applied to the proceedings below. Rules of Evidence, Pub.L. No. 93–595 § 1, 88 Stat.1948 (1975); *accord, United States v. Cohen,* 544 F.2d 781, 783 (5th Cir. 1977).

 Federal Rule of Evidence 1002 provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in [the Federal Rules of Evidence] or by Act of Congress." Motion pictures are within the ambit of the definition of photograph, *id.* 1001(2), and an original of the motion picture "includes the negative or any print therefrom." *Id.* 1001(3). Accordingly, under the Federal Rules of Evidence, the 1972 work print or cut negative as well as the answer prints and release prints are regarded as originals of the film "Ball and Chain." Whether a motion picture film is obscene must be adjudged upon viewing it in its entirety. *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1956). The contents of the film are what is sought to be proved. Thus, the "best evidence" standard embodied in rule 1002 applies to the introduction of the film. *See* E. Cleary, *McCormick on Evidence* §§ 230–32 (2d ed. 1972). Harvard's testimony that the release print of "Ball and Chain" viewed during trial was substantially the same as the work print he shipped to Radiant in New York in November, 1972, provided sufficient authentication. Fed.R.Evid. 901(a), (b)(1); *see id.* 104(b).

Assuming, without deciding, however, that the release print of "Ball and Chain" should be treated as a copy of the November, 1972 "Ball and Chain" work print rather than as an original, such secondary evidence was still admissible. Defendants had been informed by letter in advance that the contents of "Ball and Chain" would be a subject of proof at the trial. Under rule 1004(3), this "secondary evidence" was admissible after it was adequately authenticated by Harvard's testimony. *Id.* 901(a), (b)(1); *see id.* 104(b).

Overt acts set forth in the conspiracy count charge that Harvard and Remy contacted Radiant in New York with regard to photographic processing of films entitled "Back Door", "Lollipops," "Two Hours on Sunday," "High Finance," among others. Testimony and documents introduced at trial established that Harvard produced a 16 millimeter film bearing each of these titles for Levine. The evidence further established that each of these films followed the same path from creation to distribution as "Ball and Chain": (1) filming in Miami; (2) shipment of initial negative to New York for processing into dailies; (3) dailies shipped to Florida and transformed into "cut negatives"; (4) synchronization of music and sound with cut negative to produce a "work print"; (5) shipment of work print to New York to make an answer print, some of which work prints were shipped to Radiant and some directly to Levine's corporation, MPD. Special agents of the FBI, Thomas E. Burg, Gerald Daigle, and James O. Janney, testified that together or individually, they saw "Two Hours on Sunday," "Back Door," "High Finance," and "Lollipops for Judy" in North Chicago, Illinois on July 18 and September 13 of 1973, in Chicago on June 6, 1973, and in Lake Worth, Florida on February 9, 1973, respectively. They further testified that the film each viewed had the appropriate title, was of the 16 millimeter type, depicted explicit sexual acts, had a joke or twist at the end, and ran for about an hour. None of the agents could testify that Levine had distributed the particular film they saw, but some testified that they saw Harvard's pseudonym, Emilio Porticci, among the film's credits.

Defendants argue that the admission of agents' testimony about these allegedly obscene films, other than "Ball and Chain" violated the "best evidence" rule and was improper proof of other crimes. Defendants assert that the films could not be adjudged obscene unless each was introduced and shown to the jury. Moreover, they contend that the agents' testimony does not

satisfy this court's rule that proof of other crimes must be plain, clear, and convincing to be admissible. *See United States v. Broadway,* 477 F.2d 991, 994–95 (5th Cir. 1973).

At the outset we note that the indictment did not allege and the jury was not required to find that these other 16 millimeter films of Levine's were obscene. *See United States v. Hill,* 5 Cir., 500 F.2d 733, (5th Cir. 1974) *rehearing denied,* 503 F.2d 1403, *cert. denied,* 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975) (Brennan, Stewart, Marshall, JJ., dissenting). Exact proof of their contents under rule 1002 was not essential to proving that films distributed by Levine were seen elsewhere than New York. The "best evidence" rule does not apply in such instances, *see* E. Cleary, *McCormick on Evidence,* § 233 (2d ed. 1972), and the agents' testimony was sufficient to establish this. The problem, however, was that the agents could not identify the films they saw as having been distributed by Levine.

We expressly decline to rule on whether such identification was established. When considering whether to admit the agents' testimony about these other films on retrial, the district court should consider at the outset whether such testimony is sufficient to prove that the described activity was that of the defendants. If it is to be allowed, the court should limit the jury's consideration of such proof to the count which it is properly offered to support. If it relates to a conspiracy count, we have held that evidence of prior similar acts by a defendant is admissible to show intent, preparation, or plans relating to the conspiracy and also to show a common scheme, plan, design, or intent. *United States v. Banks,* 465 F.2d at 1243. If the proof is adduced to support a substantive count by establishing through evidence of prior similar acts a required mental ingredient of the offense, it is permissible only if the prior acts include "the essential physical elements of the offense charged, and [the] physical elements, but not necessarily the mental element of the offense, are clearly shown

by competent evidence." *United States v. Simmons,* 503 F.2d 831, 835 (5th Cir. 1974).

Defendants' expert witnesses, Professor Aaron Lipman and Doctor Karl McGahee, testified about the effects that visual exposure to explicit sexual material has upon the average person, basing their conclusions in part, though not exclusively, on the studies and findings of the *The Report of the Commission on Obscenity and Pornography (Commission Report).* The expert witnesses testified that the recommendation of the *Commission Report* had been rejected. In purporting to explain the difference between empirical studies and findings and recommendations, however, Professor Lipman testified that the *Commission Report's* "specific empirical studies and findings certainly cannot be rejected." As rebuttal evidence, the government offered Senate Resolution 477, 91st Cong., 2d Sess. (1970), to prove that both the empirical studies and findings and recommendations contained in the *Commission Report* had been rejected by the Senate because it was "based on unscientific testing, inadequate review of such testing [and] . . . the Commission's own findings indicate that its recommendations in many respects, are not based upon adequate research and information . . . ." Defendants argue that permitting the government to introduce Senate Resolution 477 violated their Sixth Amendment right of confrontation.

The district court did not err in permitting the resolution to be introduced as a means of impeaching defendants' expert witnesses' testimony, especially in light of Professor Lipman's statement that "the empirical studies and findings certainly cannot be rejected." *See United States v. Taylor,* 167 U.S.App.D.C. 62, 510 F.2d 1283, 1290–91, *suggestion for rehearing en banc denied,* 516 F.2d 1243 (1975); *cf. Safeway Stores, Inc. v. Combs,* 273 F.2d 295, 296–97 (5th Cir. 1960).

Defendants objected to the district court's refusal to give the following charge:

17. That fact that the defendant may profit from the distribution of the publi-

cations claimed by the government to be obscene does not afford a basis for finding that the defendants are guilty, because to sanction consideration of this fact might induce self-censorship and 'offend the frequently stated principle that commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment.' *Ginzburg v. United States,* 383 U.S. 463, 474 [86 S.Ct. 942, 16 L.Ed.2d 31]; *New York Times Co. v. Sullivan,* 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686]; *Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

The purpose of defendants' requested charge was to rebut the government's summation that Levine's films were not made for educational purposes as defendants contended but to make money. Defendants argue that the instruction was necessary properly to advise the jury that the fact money was being made from the films did not afford a basis for finding them obscene.

Evidence adduced at trial established that Levine asked Harvard to change the format of his films from simulated to explicit sex because the market required stronger pictures. In view of this proof, the charge would have been misleading, and it was properly refused by the district court. *See Ginzburg v. United States,* 383 U.S. 463, 474–75, 86 S.Ct. 942, 949, 16 L.Ed.2d 31 (1966).

■ Finally, defendants urge that the order of the United States Magistrate denying their motion to dismiss the indictment under the district court's Local Rule 10(G)(2), (G)(3) was an action required to be taken by a United States District Judge. They assert the action violates Article III of the United States Constitution, the Fifth Amendment due process clause, and the United States Magistrates Act, 28 U.S.C. § 636(b)(2) (1970). The error, if any, was harmless. Fed.R.Crim.Pro. 52(a). We discuss the point only to note that section 636(b) of the Act has been recently amended by Congress, 1976 Federal Magistrate Act Amendments, 90 Stat. 2729, Pub.L. No. 94–577 (Oct. 21, 1976), *found in,* No. 14

U.S.Code Cong. & Adm.News (Dec. 3, 1976); 20 Crim.L.Rep. (BNA) 2282–83 (Dec. 29, 1976), and sets forth detailed guidelines regarding the Magistrate's powers, which will doubtless be followed on retrial if the matter recurs.

REVERSED AND REMANDED.