UNITED STATES of America,
Plaintiff-Appellee,

v.

Jose Luis CASTRO, Alberto Duque,
Gaston Pereira, Jaime Bayon,
Defendants-Appellants.

No. 86–5315.

United States Court of Appeals,
Eleventh Circuit.

Oct. 13, 1987.

John W. Nields, Jr., Martin J. Weinstein and Richard A. Ripley, Howrey & Simon, Washington, D.C., for Jose Luis Castro.

John F. Evans and G. Richard Strafer, Zuckerman, Spaeder, Taylor & Evans, Coral Gables, Fla., and James Jay Hogan, Miami, Fla., for Alberto Duque.

Jeffrey D. Swartz, Miami, Fla. (Court-appointed), for Gaston Pereira.

Paul A. McKenna, Miami, Fla. (Court-appointed), for Jaime Bayon.

Leon B. Kellner, U.S. Atty., and Caroline Heck, Linda Collins Hertz and David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for U.S.

Before RONEY, Chief Judge, and ANDERSON and EDMONDSON, Circuit Judges.

EDMONDSON, Circuit Judge:

This appeal arises from defendant-appellant Alberto Duque's desperate, and ultimately unsuccessful, efforts to keep both his own and his family's overextended business empires afloat financially. These efforts included obtaining falsely collateralized loans and engaging in insider bank fraud. After a six and one-half month long jury trial, defendants-appellants were convicted of various substantive offenses and of participating in a single conspiracy. Defendants-appellants now challenge those convictions on a number of grounds, only one of which is meritorious: defendant-appellant Jose Luis Castro should have been indicted and tried under a separate conspiracy count. We therefore vacate Castro's conviction and remand his case for a new trial; we affirm the remaining convictions.

## I. FACTS:

### A. *Introduction*

Because the facts in this case are complex and involve several people and several companies, the following precis may make the full exposition of facts easier to assimilate.

The primary actors in this case are: Victor Duque, who was president of Colombian Coffee Company (Colombian Coffee); Alberto Duque—Victor's brother—who owned and operated General Coffee Company (General Coffee); Jose Luis Castro, a Miami banking lawyer employed by Alberto Duque; Jaime Bayon, vice-president of General Coffee; and Gaston Pereira, a senior vice-president of City National Bank who eventually took a leave of absence from that post when he was selected by Alberto to be chief financial officer and, later, president of Colombian Coffee. The most relevant entities, in addition to the ones already mentioned, are: City National Bank (CNB), a Miami bank; City National Bank Corporation (CNBC), the holding company that controlled CNB; Luis A. Duque E. Hijos Limitada (Limitada), a Colombian coffee growing company; and Domino Investments, Ltd. (Domino), Alberto's personal holding company. Alberto owned or controlled all of these entities except Limitada, which was owned by the Duque family.

The principal lenders involved in this case included two Panamanian banks—Banco de Iberoamerica (Iberoamerica) and Banco Exterior, S.A. (Exterior)—and a consortium of banks headed by Shawmut Boston International Banking Corporation (the consortium).

Alberto and the other defendants-appellants in this case were convicted, in general terms, of two separate kinds of offenses:

fraudulently obtaining loans for Alberto's businesses by creating fictitious collateral (i.e., coffee company inventory) against which to borrow; and committing insider bank fraud by pledging CNB certificates of deposit—without CNB's knowledge—as security for other loans for Alberto's businesses.

### B. *1979 and 1980*

The Duque family owned Limitada, a Colombian company that grows and exports green coffee beans, and Colombian Coffee, a New York trading company that acted as a middleman for the purchase and importation of green coffee beans. As mentioned, Victor Duque (hereinafter Victor) was the president of Colombian Coffee, although Victor resided in Colombia.

In 1979, Alberto started General Coffee, a coffee roasting company in Miami, Florida. General Coffee was wholly owned by Alberto through Domino, his personal holding company. Alberto was chairman of the General Coffee board, and he appointed Camilo Bautista (then age 23) as president of General Coffee. Jose Luis Castro became general counsel to General Coffee in early 1980 and also was made a director of the company.

In early 1980, before General Coffee became operational, Alberto decided to acquire an interest in CNBC by investing $3 million in the City Voting Trust. The Trust was a group of investors whose beneficial interest in CNBC was 50.1 percent.

At about this same time—early 1980— General Coffee became operational. General Coffee financed its early operations with a $3 million line of credit secured by General Coffee's coffee inventory. The collateral level, i.e., the coffee inventory, was monitored by an independent company (Lawrence) that obtained its information from General Coffee employees who also were bonded representatives of Lawrence.

By late 1980, Alberto had decided to increase his portion of the Trust to $5.6 million. The CNBC agreement was closed in February 1981; and Castro became a

member of the CNB board that same month. He remained a board member until June 1983.

### C. *1981*

Alberto decided, in 1981, that he wanted more control of CNBC and therefore began acquiring stock secretly. By August he had agreed to buy out other members of the Trust for $30 million. The agreement carried a penalty provision: if Alberto did not close the deal by February 1982 he would forfeit a $1 million deposit. Pursuant to this proposed buy-out, Alberto submitted a package of financial documentation to the Federal Reserve. These financial statements, which were significantly overstated, were prepared by Alberto and Bautista.

At roughly the same time, Alberto continued to expand his business empire by acquiring Allsun Juices (Allsun), a citrus processing operation. Allsun's lines of credit, which were with various banks, were collateralized with juice inventory. As with General Coffee, Lawrence monitored Allsun's collateral levels.

During 1980–1981, General Coffee engaged in creating an inaccurate picture of its coffee collateral, which, of course, increased the collateral basis against which General Coffee could borrow on its line of credit. Bautista, Alberto and Jaime Bayon (who was a vice president of General Coffee) directed employees to falsify information on Lawrence collateral certificates. Alberto and Bautista also devised a scheme in which bags of coffee beans were placed in front of and on top of hollow cages and wooden pallets, thereby creating the illusion that General Coffee had more inventory than it actually possessed.[1]

Still acquisitive, Alberto was considering in late 1981 whether to purchase Chase and Sanborn so that General Coffee could distribute its coffee under a nationally recognized name brand. At the same time, General Coffee continued to require more and more cash; moreover, by late 1981 General

---

**1.** In a similar scam, Bautista and Bayon unsuccessfully sought to have Allsun employees put water in juice drums to inflate the apparent amount of Allsun inventory.

Coffee owed Colombian Coffee more than $5 million for coffee financed by and purchased from Colombian Coffee.

### D. *1982*

Only a few days before the February 1982 deadline to close the $30 million CNBC buy-out, Alberto had no long-term financing for the deal. He therefore obtained short-term, high interest "bridge" financing for $21.5 million from a group of foreign investors known as ITKA.[2] Alberto used General Coffee and the CNBC shares to guarantee the ITKA obligation. To cover the remaining $8.5 million, Alberto used overdraft checks drawn on General Coffee's and Colombian Coffee's accounts.

The day after the CNBC deal was closed—and while the overdraft checks were processing—Alberto, Bautista and Castro arranged a $9 million loan from Iberoamerica (one of the Panamanian banks mentioned earlier) to Domino. To secure the loan, Alberto agreed to have CNB place $9 million in a high-yield certificate of deposit (CD) with Iberoamerica.[3] CNB knowingly made the deposit and received interest payments on it. The government alleged, however, that CNB was not made aware that the CD was pledged as security.[4] This loan, which covered the General Coffee and Colombian Coffee overdrafts, eventually was repaid.

The same month—February 1982—Alberto committed to buying Chase and Sanborn. As part of the commitment, Alberto had to pay Chase and Sanborn $10 million on March 15, 1982. Alberto got part of this money by getting CNB to loan General Coffee $3 million, unsecured; the balance was covered with an overdraft check on General Coffee's CNB account. To repay

the overdraft, Castro approached another Panamanian bank, Exterior, with a proposal similar to the earlier $9 million Iberoamerica CD loan arrangement. Castro, Alberto and Bautista worked out the details with Exterior: CNB would place $8 million in a high interest Exterior CD as security for an $8 million loan to Domino.[5] Again, the government alleged CNB was aware of the CD but not that the CD was pledged against a loan. The $8 million covered the overdraft on General Coffee's CNB account.[6]

While Alberto's financial legerdemain had covered the short-term cash problems, he needed a longer-term financing solution. Thus, in March, 1982, Castro contacted the Arab Banking Corporation (ABC) to arrange long-term financing to cover the $21.5 million ITKA short-term loan. Eventually, an agreement was signed in June, 1982, in which ABC loaned Alberto $22 million; the loan was guaranteed by Alberto, Limitada, General Coffee, Colombian Coffee and Domino.

The $22 million ABC loan paid off the ITKA loan but left outstanding the $8 million Exterior loan (the proceeds of which were used to purchase Chase and Sanborn). Unable to obtain long-term financing to replace the Exterior loan, Alberto had Castro arrange for CNB to renew the CD with Exterior and to renew the Exterior to Domino loan.[7]

At this same time, Alberto continued his search for additional sources of cash. As part of this search, in March 1982 Alberto and Bautista arranged a $2 million loan for General Coffee, pledging as security fictitious coffee contracts that purported to represent coffee purchased from Colombian Coffee. This loan was obtained from

---

**2.** The rate was 20 percent interest for the first month and 23 percent if extended beyond one month.

**3.** Iberoamerica charged Domino 1 percent more interest than Iberoamerica paid on the CD.

**4.** Neither the CD nor the loan violated 18 U.S. C.A. sec. 656 (misapplication of bank funds); keeping the pledged nature of the CD secret is the criminal act. *See* note 25, *infra.*

**5.** The "1 percent above interest paid" fee arrangement used in the Iberoamerica loan also was arranged with Exterior.

**6.** As a result of all these deals, for a one-month period in 1982, $20 million of CNB's $38 million capital was either loaned directly or pledged to secure loans to Alberto's companies.

**7.** The renewed CD, of course, was again pledged against the loan.

Shawmut Boston International Banking Corporation.

Already seriously overextended, the Duque businesses were hit hard in the summer of 1982 by a series of developments in Colombia. First, a major Colombian bank failed, which resulted in the call-in of short-term notes throughout that country. Limitada was hard hit by this call-in and needed to generate, quickly, $10 million in cash. Victor Duque helped raise this cash by manipulating Colombian Coffee "trust receipts."

Trust receipts are documents commonly used by lenders and borrowers who participate in commodity importation. The receipts are a means of securing, prior to the time of sale, a line of credit loan. In Colombian Coffee's case, Colombian Coffee financed its trading operation by credit lines with various banks. To borrow against these lines, Colombian Coffee would grant its lenders a security interest in ocean bills of lading, which are negotiable title documents that represent coffee that is on board vessels in transit from Colombia. So that Colombian Coffee's customers could get possession of the shipments (and, thus, Colombian Coffee could get paid), the banks would release the bills of lading to Colombian Coffee in exchange for trust receipts. These trust receipts represented a promise by Colombian Coffee to repay the loans from the proceeds of the sale of the shipments. The banks retained a security interest in the proceeds of these sales.

Rather than paying off the loans secured by the trust receipts, however, Victor diverted millions of dollars of Colombian Coffee's pledged proceeds to Limitada. At the same time, Colombian Coffee's cash problems were made worse by the $12 million in receivables owed Colombian Coffee by General Coffee. Alberto partially eased this cash shortage by arranging a loan from CNB to Colombian Coffee. Despite efforts to keep these difficulties secret, some of Colombian Coffee's lenders became aware of Colombian Coffee's diversion of funds. Those banks believed, however, that the financial crisis was brief and had been weathered. Alberto, though aware of and informed about the Colombian Coffee travails, apparently did not actively participate in this trust receipt fraud.

In August 1982, however, things in Colombia got much worse for Limitada when the government in power was turned out. The new government, eager to pursue allegations that major Colombian banks had given Limitada preferential loans, refused to help Limitada. As a result, the cash-flow pressure on Limitada increased as it no longer could rely on Colombian sources of credit.

Limitada, having effectively purged Colombian Coffee of all available cash, turned to General Coffee for the cash infusions it desperately needed to remain afloat. Alberto responded by devising a scheme involving false bills of lading—created in Colombia and sent to Colombian Coffee and General Coffee—that could be used as collateral to obtain more cash. This scam allowed General Coffee and Colombian Coffee to obtain millions of dollars in loans by pledging to United States banks false bills of lading for coffee supposedly in transit from Colombia. Bautista was aware of and facilitated this bill of lading charade.

By the end of 1982, Alberto was exploring the possibility of consolidating his companies' borrowing into a single line of credit provided by the consortium of banks mentioned earlier. As part of his negotiations with the consortium, Alberto produced false documents pertaining to receivables and inventories. One of the documents was a false accounts receivables "aging." [8] In December 1982 the consortium agreed to establish a $37 million line of credit with General Coffee. General Coffee put up as collateral its accounts receivable, coffee inventories and ocean bills of lading for coffee in transit.[9]

---

**8.** An "aging" report is a list of customers, the amounts each customer owes and the date payment is due.

**9.** Again, Lawrence was to monitor the collateral levels.

### E. *1983*

By early 1983 General Coffee and Colombian Coffee were using false bills of lading to increase the collateral base against which they could borrow. At the same time, Alberto was overseeing the creation of falsified General Coffee agings and collateral certificates.[10] Control of the Duque businesses also changed somewhat at this time as the Duque family shifted control of Limitada and Colombian Coffee to Alberto. Alberto then named defendant-appellant Gaston Pereira, then a senior vice-president at CNB, as Colombian Coffee's chief financial officer and, later, president of Colombian Coffee.[11] At about this same time—early 1983—the various Colombian Coffee lenders, now suspicious that they were being hoodwinked, began to question Pereira and Alberto about Colombian Coffee's financial affairs.

In response to these queries, top members in the Duque empire held a meeting in February 1983 to discuss how to proceed. Alberto, Pereira, Bautista and others were present; Castro was not. Pereira argued that the long-standing tide of fictitious documentation had to stop. Despite those protestations, however, Colombian Coffee continued to pledge false bills of lading; and General Coffee continued to fictionalize its collateral base.

On March 7, 1983, consortium leaders met with Alberto, Bautista and Pereira and informed the Duque representatives that, as of that same day, the consortium was starting an audit of General Coffee and intended to contact those debtors listed on the latest aging to confirm the existence of the receivables listed. In early April, as part of this investigation, the consortium sought to copy 49 ocean bills of lading held by General Coffee and pledged as collateral to the consortium.

On April 11, 1983, consortium representatives again met with Duque representatives (Alberto, Bautista and Pereira) and disclosed that the auditors were unable to confirm the accounts receivable provided by General Coffee.[12] The consortium representatives therefore demanded an immediate, accurate aging.

In response to the consortium's demands, Alberto convened a meeting and ordered the creation of a new, falsified aging. Bayon at first balked and urged that General Coffee turn over an accurate accounting; he subsequently changed his mind, however, and helped create a new, still falsified, aging.[13] This falsified aging then was given to the consortium with assurances it was accurate.

In a last, futile flurry, Alberto sought in late April to refinance the Colombian Coffee trust receipts with fixed assets. Negotiating with the Colombian Coffee lenders, Alberto assured them that the General Coffee consortium loan arrangement was functioning without difficulty. The Colombian Coffee lenders wisely did not accept the refinancing proposal.

By this time the consortium had at last confirmed the bogus nature of the bills of lading and other collateral securing the General Coffee loans. Accordingly, on May 10, 1983, the consortium filed suit for fraud. Shortly thereafter Alberto and his companies filed for bankruptcy; at the time, Alberto and the various Duque businesses had debts in excess of $100 million.[14]

Subsequently, 12 defendants were charged in a 95–count indictment; Alberto

---

10. As a result of all this activity, General Coffee soon had borrowed $34 million on the $37 million consortium credit line.

11. Pereira apparently took a leave of absence at CNB when named to these jobs.

12. The next day the consortium representatives took physical possession of the 49 ocean bills of lading; those bills of lading were bogus.

13. General Coffee actually had $4 million in receivables; the new aging reflected receivables totaling $8.6 million.

14. The Exterior note had come due on several occasions during the intervening months. On each such occasion Castro renewed the arrangement but allegedly without CNB ever becoming aware that the CD was pledged against a loan to Domino. The Exterior loan was not repaid.

was charged in 62 of those counts.[15]  Six of the 12 pleaded guilty, and the remaining six defendants were tried jointly in a jury trial that lasted over six months.  All four defendants-appellants were charged under one conspiracy count.  *See* 18 U.S.C.A. sec. 371.

## II. *Discussion*

### A. *The Case Presents Not One Conspiracy, But Two*

All of the charges leveled at Castro involved only the two CD arrangements involving CNB and the two Panamanian banks, Exterior and Iberoamerica.[16]  The government argued that, while CNB was aware of the existence of the CDs, Castro concealed from CNB that the CDs were pledged to secure loans to Domino.[17]  Castro raises four grounds challenging his conviction; only one of these issues—the single versus multiple conspiracy question—merits discussion.

All defendants, Castro included, were charged with one conspiracy.  Castro contends, however, that the face of the indictment actually alleged, and the evidence adduced at trial proved, two separate conspiracies.  In Castro's view, one conspiracy involved Bautista's, Castro's and Alberto's efforts to keep the pledged nature of the CDs secret and thereby to misapply CNB funds (the CD conspiracy); while the other, unrelated conspiracy involved the efforts of coffee company employees—Bautista, Alberto, Pereira, Bayon and all the other codefendants except Castro—to create ficti-

tious records that were used to obtain millions of dollars of loans fraudulently from banks other than CNB (the inventory conspiracy).

The government, on the other hand, argues that the indictment charged, and the evidence adduced proved, a single conspiracy among all the defendants with one common objective: to obtain loans for Alberto through deception of, and false representations made to, lending institutions.

As a preliminary matter, we must decide whether this is a misjoinder or a variance issue.[18]  Castro couches his argument in terms of improper joinder under Federal Rule of Criminal Procedure 8(b).  The government, however, maintains that the issue is whether there was a variance between a single charged conspiracy and proof of multiple conspiracies; therefore, in the government's view, we must focus on the evidence adduced.

This court discussed this issue in *United States v. Andrews*, 765 F.2d 1491, 1496–97 (11th Cir.1985), *cert. denied sub nom. Royster v. United States*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986):

To determine whether joinder is sound, a reviewing court must examine the face of the indictment.  If the indictment's allegations, taken as true, establish a single conspiracy, and there is no claim of prosecutorial bad faith or an erroneous interpretation of law, the court must conclude the joinder was proper.  In some cases, however, it has been held appropriate to consider the evidence ad-

---

**15.**  The 12 defendants were charged with a variety of offenses.  For purposes of this opinion, the specific charges relevant to each defendant-appellant will be explained when his arguments are discussed.

**16.**  Castro was indicted on one count of misapplication of bank funds, 18 U.S.C.A. sec. 656, three related counts of wire fraud, 18 U.S.C.A. sec. 1343, and one related conspiracy count.  18 U.S.C.A. sec. 371.

**17.**  As mentioned earlier, Domino was wholly owned by Alberto.

**18.**  The nature of the issue is significant because its character affects the standard of review we apply to decide if an error was made.  Whether

misjoinder occurred is a question of law, subject to de novo review by this court.  *United States v. Levine*, 546 F.2d 658, 661 (5th Cir.1977).  On the other hand, "whether the evidence supports finding a single conspiracy is a question of fact for the jury", *United States v. Champion*, 813 F.2d 1154, 1165 (11th Cir.1987), and is therefore error only if a reasonable factfinder could not have found beyond a reasonable doubt the existence of a single conspiracy.  *Id.* at 1166.  As discussed, *infra*, this question is academic because we believe that Castro prevails under either standard.  Moreover, since both misjoinder and variance errors are subject to an essentially harmless error analysis, see *infra*, whether the error was a misjoinder or a material variance is of no moment to our ultimate conclusions regarding prejudice.

duced at trial as well as the allegations of the indictment in deciding a Rule 8(b) claim.

*Id.* at 1496. Regardless of whether the reviewing court considers solely the indictment or both the indictment and the evidence adduced, "the reviewing court must determine whether there was 'a substantial identity' of facts and participants between the offenses charged. The character of the acts must have been similar, and each of the actors must have known that he acted in furtherance of a common plan in which other participants were involved." *Id.*

■ Castro was improperly joined. *See United States v. Bruun*, 809 F.2d 397 (7th Cir.1987); *United States v. Marionneaux*, 514 F.2d 1244, 1248–49 (5th Cir.1975); *United States v. Gentile*, 495 F.2d 626 (5th Cir.1974). In simple terms, the actions alleged in the indictment before us do not constitute a series of events as envisioned by Rule 8(b). The facts underlying the various acts relating to the inventory conspiracy and to the CD conspiracy are not "so closely connected that proof of such facts is necessary to establish each offense", *id.* at 630; nor is there a substantial identity of facts and participants involving similar acts in furtherance of a common plan.[19] *See Andrews*, 765 F.2d at 1496; *Marionneaux*, 514 F.2d at 1248–49.

Although the existence of a conspiracy often allows joinder when joinder otherwise would be improper, joinder is allowed in such a situation only if "the substantive offenses alleged in the indictment fall within the scope of the conspiracy." *Id.* at 632.

The only overt acts alleged in the conspiracy count relating to the CD conspiracy were unrelated, in any meaningful way,[20] to the overt acts alleged in the conspiracy count relating to the inventory conspirators.[21] In addition, the crimes committed were of totally different natures and types. *See United States v. Bertolotti*, 529 F.2d 149, 157 (2d Cir.1975).

What we have in this case is the allegation of a so-called "wheel" conspiracy in which two common defendants-appellants—Alberto and Bautista—form the "hub" and in which Castro is one of several "spokes." The government has failed, however, to demonstrate that there was a "rim" to this wheel. *See United States v. Levine*, 546 F.2d 658, 663 (5th Cir.1977).[22] That is, the government adduced no evidence which demonstrated that Castro, as one of the spokes, knew or should have known about the existence, actions or objectives of the coffee inventory spokes. *See id.; United States v. Perez*, 489 F.2d 51, 59 n. 10 & n. 11 (5th Cir.1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Phrased somewhat less metaphorically, the government has failed to prove that a common objective existed among the charged conspirators. *Id.* at 59–61. Though each of the conspiracies had, broadly speaking, a similar illegal objective—i.e., each aided, by fraudulent means, Alberto's efforts to obtain cash for his companies—neither depended on, was aided by or had any operational interest in the success of the other conspiracy. *See id.* at 60 (describing the basis on which the Court reversed the con-

---

**19.** The government's primary witness on the CD deals—Bautista—stated that only he, Castro and Duque knew that the CDs had been pledged against the loans to Domino. Conversely, no evidence was adduced that Castro knew about the coffee inventory schemes.

**20.** Carried to an extreme generalization, of course, anyone participating in any way in an illegal activity to obtain money could be said to be part of one conspiracy.

**21.** In *Marionneaux*, 514 F.2d at 1248, two separate conspiracies were charged in one indictment. There was one overlapping participant in the two conspiracies; and the actions of the various conspirators involved, generally stated, one objective: to prevent witnesses from testifying against a particular person. The court re-

versed the convictions, holding the defendants were misjoined because there was no "series" of acts. The court noted that, but for the factors just mentioned, "the conspiracies have different participants and completely different overt actions." *Id.* This case presents a similar situation in that there are some overlapping participants but no evidence that Castro's acts were in any way a part of the coffee inventory scheme.

**22.** The holding in *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986), discussed in the text *infra*, overturned that portion of *Levine* that held misjoinder is per se reversible error. *Lane* did not affect, however, the balance of *Levine's* analysis.

victions in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

Whether viewed as a misjoinder or a variance, the government failed to prove that there was one conspiracy. *See Levine*, 546 F.2d at 663.[23]

■ Having decided that joinder was improper, we must address whether that error was harmless. *See United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) ("an error involving misjoinder ... requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253)).[24] We cannot conclude, on these facts, that the error was harmless.

Castro maintains that he was prejudiced by the spillover effect of being tried jointly with the inventory conspirators. Put differently, the jurors tended to associate Castro with the illegal acts of the inventory conspirators; in doing so they transferred guilt to him. *See Krulewitch v. United States*, 336 U.S. 440, 454, 69 S.Ct., 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring) (referring to fact that jurors "are ready to believe that birds of a feather flock together"); *Levine*, 546 F.2d at 662. In a six and one-half month trial, the portion of the trial concerning the CD conspiracy consumed only 10 trial days. Moreover, one month passed between Castro's opening argument and the appearance of the first witness relevant to his charges; and it was two full months after that be-

fore the next witness relevant to Castro's charges testified.

Given the imponderables of trials, it is difficult to evaluate the specific impact a joint trial has on various defendants. In this case a single conspiracy was charged, yet two conspiracies involving disparate activities were proved; the effect was to subject Castro to extensive evidence—several months worth—relating to crimes in which Castro took no part and of which he had no knowledge. *See United States v. Bertolotti*, 529 F.2d 149, 157 (2d Cir.1975).

Voluminous evidence adduced at trial demonstrated that the inventory conspiracy involved patent, shameless fraud. It is beyond cavil that the evidence overwhelmingly showed a massive, widespread inventory scam designed to bilk lenders when the borrowers had no realistic chance of repayment. The inventory swindlers even had the arrogance to label some of the fictitious inventory documents "MM", which stood for "Mickey Mouse." To make bad matters worse, the single conspiracy theory precluded the trial judge from giving the kind of limiting instruction that is appropriate when related but separate conspiracies are tried jointly. *See Kotteakos*, 328 U.S. at 769–70, 66 S.Ct. at 1250.

Most importantly, the evidence of Castro's guilt was not overwhelming. *See Lane*, 106 S.Ct. at 732 (misjoinder error was harmless because evidence of guilt was overwhelming). The basis for concluding that Castro kept CNB in the dark regarding the pledged status of the Exterior CD revolved around certain records and telexes that were not available at trial and

**23.** Even if analyzed in variance terms, a material variance occurred because a reasonable trier of facts could not have found beyond a reasonable doubt the existence of a common goal or similarity of scheme. *See United States v. Champion*, 813 F.2d 1154, 1166 (11th Cir.1987) (relying on *United States v. Caporale*, 806 F.2d 1487, 1499–1500 (11th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987)). Although there was a certain overlap of participants, the overlap, by itself, was not sufficient to prove that one conspiracy, not two, existed. The evidence adduced was not "sufficient to show that each defendant had a general knowledge of the overall purpose and scope of the conspiracy." *United States v. Michel*, 588

F.2d 986, 995 (5th Cir.1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979) (quoted in *United States v. Stitzer*, 785 F.2d 1506, 1518 (11th Cir.), *cert. denied sub nom. Perna v. United States*, — U.S. —, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986)).

**24.** In *Lane*, the Court concluded that the joinder error was harmless given the "overwhelming evidence of guilt." *Lane*, 106 S.Ct. at 732. Variance cases provide a very similar analysis; once the existence of a material variance is proved, the defendant then must demonstrate substantial prejudice. *See Champion*, 813 F.2d at 1166; *Caporale*, 806 F.2d at 1499.

Bautista's rather weak testimony.[25] The possibility that spillover prejudice affected the outcome increases as the proof of guilt decreases.[26]

■ We realize, of course, that the jury acquitted Castro on the misapplication of bank funds charges arising from the Iberoamerica CD but convicted him on the Exterior CD misapplication charges. Although these mixed verdicts mitigate against a finding of harmful error, *see Champion*, 813 F.2d at 1167; *Caporale*, 806 F.2d at 1501, they are not dispositive of harmlessness. Given the marginal nature of the evidence against Castro, the number of unrelated codefendants, the compellingly offensive and voluminous nature of the inventory conspiracy evidence, and the length of the inventory conspiracy portion of the trial versus the CD conspiracy por-

tion of the trial, we are unable to conclude that the joint trial did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Lane*, 106 S.Ct. at 732 (quoting *Kotteakos*, 328 U.S. at 775, 66 S.Ct. at 1253).[27]

■ Finally, Pereira raises the converse misjoinder or variance claim, arguing that he was misjoined with Castro.[28] Of course, if Castro was improperly joined with the other defendants, those defendants were misjoined with Castro. We nevertheless grant no relief because the error was harmless. *See Lane*, 106 S.Ct. at 732. Several factors support our conclusion. The testimony relating to Castro's illegal activities took but a few days of a six and one-half month trial, the balance of which related to the conspiracy in which Pereira was involved; and Castro's activities were not so

---

**25.** The substantive counts on which Castro was indicted and which formed the basis for the conspiracy charge were misapplication of bank funds, 18 U.S.C.A. sec. 656 and use of the wires in furtherance of the misapplication scheme. 18 U.S.C.A. sec. 1343. To convict for criminal misapplication under sec. 656, "the government must prove that the accused knowingly participated in a deceptive or fraudulent transaction." *United States v. Stefan*, 784 F.2d 1093, 1096 (11th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 650, 93 L.Ed.2d 125 (1986). Castro's part in the loan to Duque, an insider, was not criminal unless Castro knew or should have known that the transaction was deceptive or fraudulent. Presumably, if CNB was aware that the CD was pledged as security for the Exterior loan to Domino—as Castro contends CNB was—Castro's actions were not crimes. The government sought to prove Castro's knowledge of the fraudulent nature of the CD deal by submitting evidence tending to show that Castro "sanitized" telexes sent by Exterior that indicated the pledged nature of the CD and by Bautista's testimony.

All of the documents relating to both the Exterior and Iberoamerica CD deals were missing from the CNB files and therefore unavailable to prove, or disprove, Castro's alleged sanitization efforts. In addition, the personal files of Alan T. Abess, Jr.,—the person who, as CNB's vice-president for investments, was directly involved in the CD agreements for CNB—also were missing. At trial, Abess proved singularly unable to remember specifics regarding the documentation CNB received from Iberoamerica, Exterior or Castro regarding the details of the CDs. The missing files were significant because those files allegedly would have contained telexes confirming the terms of the deals—telexes

Castro contended were complete and unexpurgated. Castro could not gain access to the Exterior and Iberoamerica files, which presumably would have contained copies of the telexes, because, under Panamanian law, those banks could not turn over their records without a waiver by the customer, CNB. CNB would not grant such a waiver for Castro. All of these problems render the telex/records evidence problematic.

The only direct testimony that Castro acted with knowing deception came from Bautista. The weight of that testimony is undercut by Bautista's credibility problems—counsel laid out a lengthy past history of significant lying, a history Bautista conceded was accurate—and by the conclusory nature of the testimony, which was unsupported by corroborating evidence.

We do not imply that the evidence was insufficient to convict Castro; we only note that the case presented against him was indirect and not overwhelming.

**26.** Obviously, it is more likely that the jury would have reached the same, guilty verdict—even without the erroneous joinder or material variance—when proof of guilt is strong.

**27.** Having concluded that Castro's conviction must be overturned, we do not address his other claims of error.

**28.** Pereira stated in his appellate brief that he "adopted" Castro's arguments regarding variance. Although Pereira cannot truly adopt those arguments—after all, Pereira and Castro are very differently situated—we construe his adoption as an argument that he was misjoined with Castro and suffered harmful error when he was subjected to the CD conspiracy evidence.

aggravatingly reprehensible that they presumptively would have derivatively tainted the jury's view of Pereira. Any derivative taint arising from the six months worth of coffee inventory conspiracy evidence—which evidence was so pejorative that it probably did affect the jury's view of Pereira—is acceptable because that evidence was properly admitted against Pereira as evidence of the conspiracy of which he was a part and for which he properly was charged; furthermore, the evidence of Pereira's guilt was more substantial.[29] We also note that the government's evidence regarding the CD conspiracy did not implicate Pereira in any way—Bautista specifically testified that only he, Alberto and Castro knew that the CDs were pledged—and the evidence at trial made clear that Pereira was not working at CNB when the CD agreements were concluded and was on leave of absence from CNB when he aided the coffee inventory conspirators.[30] Given these circumstances, we think the jury would have returned the same, guilty verdict even if Pereira had been tried separately from Castro. *See id.*

### B. The Federal Bill of Lading Act Covers Bills Originating Outside of the United States.

Alberto[31], who was indicted on 62 counts,[32] first argues that the statute under which he was indicted and convicted on 49 of those counts—49 U.S.C.A. sec. 121, which is part of the Federal Bill of Lading Act (FBLA), 49 U.S.C.A. secs. 81–124[33]—is inapplicable to the acts Alberto committed. Specifically, Alberto contends that 49 U.S.C.A. sec. 121, when read in conjunction with 49 U.S.C.A. sec. 81, makes criminal solely the creation or the negotiation of false bills of lading that originate in the United States. All of the fictitious shipments, and thus all of the bills of lading, at issue in this case originated in Colombia. Alberto therefore maintains that creating (and negotiating) the bogus bills of lading representing those nonexistent shipments was not violative of 49 U.S.C.A. sec. 121.

29. The government put on evidence—testimony and records—showing that after Pereria was named, in early 1983, chief financial officer, and later president, of Colombian Coffee, he acted to assuage lenders' fears that they were being lied to even while Pereira was aware that collateral levels had been falsified and continued to be falsified.

It is uncontested that at least by February 11, 1983—when Pereira and other Duque advisors met to discuss the deteriorating financial situation—Pereira was fully aware of General Coffee's and Colombian Coffee's long histories of illegal inventory practices. Moreover, the evidence showed that Pereira was aware that Bautista had spearheaded the false collateral efforts. Despite this knowledge, Pereira never informed any of the lenders about the nonexistent coffee inventory. Pereira also assured Colombian Coffee lenders that General Coffee's credit facility with the consortium was operating properly, even when he knew it was not.

Pereira was convicted of transmitting false bills of lading, prepared by Bautista, to a bank, Bank of Credit and Commerce Internatiuonal (BCCI), to obtain payment to Colombian Coffee on a letter of credit opened at BCCI by General Coffee. The transmittal letters, signed by Pereira, were sent on February 25, 1983—two weeks after the meeting at which the fictitious collateralization issue was discussed in detail. Despite his knowledge of the long-standing pattern of bogus bills of lading and despite his awareness of the financially strapped, nearly

bankrupt, condition of General Coffee and Colombian Coffee, Pereira nonetheless transmitted the bills of lading to secure further loans to Colombian Coffee.

30. Alberto hired Pereira to work at CNB in August 1982 and named him chief financial officer of Colombian Coffee in January, 1983. The CD agreements were struck in February and March 1982. Pereira submitted evidence that he was on leave of absence from CNB once Alberto selected him to serve at Colombian Coffee in January 1983.

31. Defendant-appellant Pereira raises the same claim and has adopted Alberto's arguments as to this issue. For ease of citation, we shall refer to both Alberto and Pereira as "Alberto," although all arguments—and resolutions thereof—obviously relate to both Alberto and Pereira.

32. Alberto was indicted on the following charges: one county of conspiracy, 18 U.S.C.A. sec. 371; seven counts of wire fraud, 18 U.S.C.A. secs. 1343 and 2; four counts of making false statements to federally insured banks to influence their actions, 18 U.S.C.A. secs. 1014 and 2; 49 counts of knowingly negotiating false bills of lading, 49 U.S.C.A. sec. 121 and 18 U.S.C.A. sec. 2; and one count of willful insider misapplication of bank funds, 18 U.S.C.A. secs. 656 and 2.

33. The FBLA also is known as the Pomerene Act.

The convictions predicated on section 121 accordingly must be overturned, in his view. We disagree.

■ This issue, which is one of first impression in this or any other circuit, requires us to consider and interpret two sections of the FBLA. The criminal portion of the FBLA under which Alberto was convicted states:

Any person who, knowingly or with intent to defraud, falsely makes, alters, forges, counterfeits, prints or photographs any bill of lading purporting to represent goods received for shipment among the several States or *with foreign nations,* or with like intent utters or publishes as true and genuine any such falsely altered, forged, counterfeited, falsely printed or photographed bill of lading, knowing it to be falsely altered, forged, counterfeited, falsely printed or photographed, or aids in making, altering, forging, counterfeiting, printing or photographing, or uttering or publishing the same, or issues or aids in issuing or procuring the issue of, or negotiates or transfers for value a bill which contains a false statement as to the receipt of the goods, or as to any other matter, or who, with intent to defraud, violates, or fails to comply with, or aids in any violation of, or failure to comply with any provision of this chapter, shall be guilty of a misdemeanor, and, upon conviction, shall be punished for each offense by imprisonment not exceeding five years, or by a fine not exceeding $5,000, or both. August 29, 1916, c. 415, sec. 41, 39 Stat. 544.

49 U.S.C.A. sec. 121 (emphasis added).[34]

On the other hand, the first section of the FBLA provides:

Sec. 81.  Transportation included

Bills of lading issued by any common carrier for the transportation of goods in any Territory of the United States, or the District of Columbia, or from a place in a State to a place in a foreign country, or from a place in one State to a place in another State, or from a place in one State to a place in the same State through another State or foreign country, shall be governed by this chapter. Aug. 29, 1916, c. 415, sec. 1, 39 Stat. 538.

49 U.S.C.A. sec. 81.

The issue is whether section 81 sets forth all of the possible applications of the FBLA or only seeks to make clear a certain subset of a larger group.

Our objective when interpreting a statute is to determine the drafters' intent. Because the words chosen by Congress are the most direct evidence of that intent, our starting point is the language of the statute at issue. *See United States v. Rojas-Contreras,* 474 U.S. 231, 106 S.Ct. 555, 557, 88 L.Ed.2d 537 (1985). If the language is a clear expression of congressional intent, we need not refer to the statute's legislative history. *Id.*

Applying this analysis to section 121—standing by itself—the language of that section unambiguously applies to shipments "among the several states or *with foreign nations.*" (emphasis added). The bogus bills of lading at issue undeniably involved commerce with foreign nations. Thus, on its face section 121 reaches the situation we face today.

Section 81, however, could be read as a clear congressional intent to the contrary if the purpose of section 81 is exclusionary. Put differently, if Congress sought to make section 81 the definitive listing of all the settings in which the FBLA could apply, then section 121 is necessarily limited thereby and is not applicable to the facts of this case. We do not, however, believe that is the case.

First, section 81 states on its face that its purpose is to set forth transportation "included" in the FBLA. Use of the term "includes" normally indicates "a general class, some of whose particular instances are those specified in the definition." *Helvering, C.I.R. v. Morgan's, Inc.,* 293 U.S. 121, 125 n. 1, 55 S.Ct. 60, 61 n. 1, 79 L.Ed.

---

**34.** Although the statute states that a violation of 49 U.S.C.A. sec. 121 is a misdemeanor, its penal-ty provision makes clear that such a violation is actually a felony.

**1050**

232 (1934). Congress could have used other terminology had it intended section 81 to represent the entire scope of FBLA coverage.[35] Use of "included" indicates a nonexclusive intent.

Second, our inclination to interpret the plain meaning of "transportation included" as a partial, nonexclusive listing is buttressed by consideration of the general legal climate concerning the extent of congressional authority over interstate and foreign commerce in 1916, which is when section 81 was drafted and enacted. There was considerable debate and uncertainty in 1916 as to Congress's powers under the interstate commerce clause of the Constitution. On the other hand, it was beyond dispute then, as now, that Congress had wide powers to regulate foreign commerce that affected the United States.

Absent some affirmative sign to the contrary, and we have found none, we believe that the most logical reading of section 81—given its language and the historical setting in which it was enacted—is that section 81 was Congress's effort to make clear the specific interstate commerce settings it sought to regulate. By doing so, Congress no doubt was trying to anticipate and to circumvent any future charges that the FBLA exceeded congressional authority. There was no need to explain that the FBLA also reached commerce originating outside this country because that point was understood.

Thus, we do not view section 81 as evincing a contrary intent to the clear language in section 121. The knowing creation or negotiation of false bills of lading that represent goods "received for shipment ... with foreign nations" includes false bills of lading that represent purported shipments that originate in foreign nations as well as those interstate shipments specified in section 81.[36] Therefore, the convictions under 49 U.S.C.A. sec. 121 were proper and those convictions must be affirmed.

## III. CONCLUSION

After a careful review of the record, we find that the remaining arguments raised by defendants-appellants are without merit and warrant no discussion. The district court's judgment as to Jose Luis Castro is VACATED and his case is REMANDED for a new trial; the judgment is AFFIRMED as to defendants-appellants Alberto Duque, Jaime Bayon and Gaston Pereira.

---

**35.** For example, Congress could have used the phrase "transportation means" or "transportation defined."

**36.** We recognize that a few courts, in interpreting similar language in 49 U.S.C.A. sec. 102, have indicated a contrary view. *See Elgie & Co. v. S.S.S.A. NEDERBERG,* 599 F.2d 1177, 1181 (2d Cir.1979) ("on shipments originating outside the United States and thus not covered by the [FBLA] a carrier is bound by its representations") (dictum), *cert. denied sub nom. South African Marine Corp. v. Elgie & Co.,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980); *Portland Fish Co. v. States Steamship Co.,* 510 F.2d 628, 631–32 & n. 7 (9th Cir.1974) (Section 22 of the FBLA, 49 U.S.C.A. sec. 102, would be dispositive "were it not for the inapplicability of the [FBLA] to bills of lading issued in foreign ports"; citing 49 U.S.C.A. section 81 as grounds for inapplicability of FBLA.)

Neither of these cases persuades us we are in error. *Portland Fish* is not dispositive of our case in that it is the law of a different circuit that involves a different section of the FBLA as applied in a civil action. Moreover, the court did not explain in the opinion the reasoning by which it concluded that section 81 was an exclusive listing of FBLA coverage. *Elgie's* reference to section 81, on the other hand, is pure dictum.

We also note that at least two district courts have come to the opposite conclusion in cases involving section 121, although both did so without any explanation of the basis for their conclusions. *See Metal Transport Corp. v. Compania National Naviera S.A.,* 268 F.Supp. 456 (S.D.N.Y.1965); *United States v. Haim,* 218 F.Supp. 922 (S.D.N.Y.1963).