**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Roberto VALERA, Defendant–Appellant.**

**No. 87–3380.**

United States Court of Appeals,
Eleventh Circuit.

May 20, 1988.

George E. Tragos, Clearwater, Fla., for defendant-appellant.

Robert W. Merkle, U.S. Atty., Garry J. Stegeland, Paul J. Moriarty, H. Manuel Hernandez, Asst. U.S. Attys., Orlando, Fla., for plaintiff-appellee.

Before HATCHETT and EDMONDSON, Circuit Judges, and MARKEY *, Chief Judge, Federal Circuit.

* Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designation.

EDMONDSON, Circuit Judge:

Defendant Roberto Valera appeals his convictions and sentences for substantive and conspiracy violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. secs. 1962(c) and (d), and for violations of the Travel Act, 18 U.S.C. secs. 1952 and 2, all deriving from drug smuggling operations. Valera alleges divers errors, including a) *Brady, Giglio,* and *Jencks* errors stemming from government failure to disclose certain documents; b) an impermissible variance between the indictment's charge of a single RICO offense and a single RICO conspiracy and evidence at trial of multiple offenses and multiple conspiracies; and c) error that allowed one defense witness to claim fifth amendment privilege.[1] Because none of these claims warrants a reversal of the convictions, we affirm.

Evidence showed that appellant Valera met Scott McKenney, then a U.S. Customs patrol officer, in February 1981. For several years McKenney had been using his knowledge of custom procedures to facilitate the transport and importation of drugs into the United States. Valera asked McKenney to arrange the importation of a shipment of cocaine from Valera's source in Colombia. McKenney knew several people that he called upon from time to time for help in importations. For Valera's venture, McKenney obtained the services of Joseph Crawford as pilot, of Danny Martin as communications expert, and of John Feller, who adapted the fuel system of the aircraft to be used. In March 1981 Crawford brought in sixty-five kilograms of cocaine from Colombia for Valera.

In meetings with McKenney, Crawford and Martin throughout the spring and summer of 1981, Valera discussed plans to bring a freighter carrying hashish to a port in Delaware and other plans to bring hashish from the Middle East into the United States, via Belize, using a large jet for the

1. We have examined appellant's other claims. They are without merit and will not be discussed.

transatlantic journey and smaller aircraft for the final leg of the importation. In fall of 1981 Valera paid Martin to set up communications in Delaware regarding the freighter venture and also had Crawford fly a plane from Florida to Delaware in connection with that same venture.

Related to the Middle East plan, Valera had Martin and Crawford travel to Belize in fall of 1982. There Martin set up radar and communications at a clandestine airstrip. Martin and Crawford investigated the feasibility of landing a large aircraft on a nearby remote road, and upon their return, reported to Valera that the road was too small to accommodate a large jet.

In October 1982 Valera sent Martin to Senegal to look into the possibility of setting up communications equipment. Valera also used Martin's services on several subsequent occasions. After 1982 Valera had no further involvement with McKenney, Crawford, and Martin.

An indictment in the case came down in May 1986, charging the existence of a RICO association in fact from June 1979 to April 1983. Valera was named in four of the racketeering acts of the substantive RICO count and in five of the overt acts of the RICO conspiracy charged in count two; he was also charged with three violations of the Travel Act, for encouraging interstate and foreign travel in aid of racketeering. After a one-week trial at which he was the sole defendant, Valera was convicted of both RICO offenses and of two Travel Act offenses. The defendant was sentenced to a total of thirty years in prison and was fined a total of $50,000.

**I. *Brady, Giglio, and Jencks Claims***

■ *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires that the government disclose to the defense evidence exculpatory to the defendant. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), requires government disclosure to the defense of promises of leniency or immunity made to government witnesses; that one prosecuting attorney may be unaware of certain promises made by another does not

affect the government's responsibility. The Jencks Act, 18 U.S.C. sec. 3500, requires that, after a government witness has testified on direct examination, the government disclose to the defense verbatim statements made or adopted by that witness which relate to the subject matter to which the witness has testified.

Defendant Valera alleges *Brady, Giglio* and *Jencks* errors as to a variety of statements and evidence. Primarily, he claims that the government acted improperly in not disclosing material that would have impeached witness McKenney: a) a memorandum prepared by Assistant U.S. Attorney Sullivan after McKenney had falsely stated to the U.S. Attorney that one Ronald Hansen, just arrested for drug smuggling, had actually been working as an undercover agent for McKenney (the Sullivan memorandum); b) the documents in McKenney's personnel file relating to the internal affairs investigation of McKenney, including a statement by McKenney to Agent Allen, who conducted the investigation, and notes that McKenney had made about the Hansen affair; c) McKenney's statements to Customs Agent Rivera who interviewed McKenney after McKenney's arrest (Rivera documents).

■ Under the Jencks Act only prior verbatim statements made or adopted by a witness and relating to his testimony need be disclosed to the defense. *See* 18 U.S.C. sec. 3500(e)(1) and (2); *United States v. Ricks*, 817 F.2d 692, 698 (11th Cir.1987); *United States v. Gaston*, 608 F.2d 607, 611 (5th Cir.1979). The Sullivan memorandum is just a report written by U.S. Attorney Sullivan and never adopted by McKenney; the Rivera documents are not verbatim statements, but summaries written by Agent Rivera of what McKenney had told him. The district court did review both documents and correctly determined that the Sullivan memorandum and the Rivera documents did not fall within the Jencks definition of "statement" because neither of them was a verbatim transcription of what McKenney had stated in his conversations with Sullivan and Rivera and McKenney had adopted neither of the statements.

■ The district court did, however, order disclosure of the notes McKenney had made on the Hansen affair and of McKenney's affidavit given to Agent Allen, because both of these documents fell within the ambit of the Jencks Act (both meeting the Act's definition as to verbatim statements). Because the government first uncovered these documents in the internal affairs file on the third day of the trial, after witness McKenney had concluded his testimony, the court permitted McKenney to be recalled for cross-examination about these verbatim documents. The district court thereby obviated any prejudice to the defense resulting from tardy disclosure of the verbatim documents. Consequently, there was no Jencks Act violation.

■ The mandate of *Brady* and *Giglio* are broader; under these principles, defendant Valera also claimed access to the Sullivan memorandum, McKenney's internal affairs investigation file, and the Rivera summaries.[2] The district court personally reviewed the Sullivan memorandum and the Rivera summaries and determined that their contents did not mandate their release to the defense under *Brady*. In light of the government's assertions, after the government's review of the internal affairs investigation files on McKenney, that there was no *Brady* material in these files, the district court also determined that disclosure was unnecessary. Appellant Valera now claims that the district court erred in its ruling and by not examining McKenney's internal investigation files *in camera* to determine for itself whether or not the files contained disclosable material. Valera claims that *in camera* review was clearly indicated because the government disclosed McKenney's statement and notes in the internal affairs file only after the government had initially claimed that the file contained no disclosable material.

■ Occasionally, it is appropriate for judges to examine personally government files to satisfy *Brady, Giglio,* or the Jencks Act. *See United States v. Griggs,* 713 F.2d 672 (11th Cir.1983) (rejecting idea that, unless the prosecution has doubts as to the non-existence of *Brady* material, a district judge has no power to conduct an *in camera* inspection). Generally, however, trial judges are not required to examine personally government files. *Gaston,* 608 F.2d at 612. How the trial court proceeds to enforce disclosure requirements is largely a matter of discretion to be exercised in light of the facts of each case.

In this case, the district court based its ruling and its refusal to review the internal affairs file not only on a simple assurance from the government as to the absence of *Brady* material in the file. In addition, the district court, outside the presence of the jury, heard testimony of defense witnesses Sullivan, Allen (who had conducted the internal affairs investigation of McKenney), and Rivera. After this hearing and based on the testimony of Allen who examined the internal affairs file while on the witness stand and determined that it contained no further disclosable material, the district court concluded that no *in camera* review by the court was necessary.

Under these circumstances, we cannot say that the district court acted incorrectly. Even had the district court improperly denied defense access to one or more of these documents, we suspect that the denial would have constituted only harmless error in this case for either of two reasons.

■ First, "[t]he purpose of *Brady* is to assure that the accused will not be denied access to exculpatory evidence known to the government but unknown to him.... [T]here is no *Brady* violation when the accused or his counsel knows before trial about the allegedly exculpatory informa-

---

**2.** While Valera states that he is asserting *Giglio* error, his arguments as to the documents in question go explicitly to *Brady* error. Valera apparently cites *Giglio,* not so much for the principle that these documents relating to McKenney contain material on government leniency toward McKenney, but rather for the idea that the government cannot excuse any

oversight or delay in disclosure due to the fact that the prosecuting attorney at trial entered the case shortly before the trial date. We therefore will direct our own discussion primarily to matters that relate substantively to *Brady,* although we of course remain mindful of the dictates of *Giglio* in our review.

tion and makes no effort to obtain its production." *United States v. Cravero,* 545 F.2d 406, 420 (5th Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *see also United States v. Prior,* 546 F.2d 1254, 1259 (5th Cir.1977) ("[N]umerous cases have ruled that the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself."). The defense here had interviewed Assistant U.S. Attorney Sullivan concerning McKenney's statements about Hansen and had obtained files of the Rivera investigation from discovery in the pending trial in another case. Because the defense was already in possession of the information presented in the Sullivan memorandum and in the Rivera documents, government failure to produce these documents cannot constitute *Brady* error.

 Second, Valera's claims of *Brady, Giglio,* and Jencks Act violations go chiefly to material that the defense wished to use to impeach witness McKenney. McKenney had already entered a guilty plea to bribery and racketeering. At Valera's trial, McKenney testified that he had intervened in the Hansen affair, falsely claiming that Hansen was an informant. This guilty plea and McKenney's own admissions provided the defense information and evidence by which it could and did impeach witness McKenney. Cross-examination of McKenney by the defense illustrated how and why McKenney was disposed to cooperate with the government. The files and documents requested would have only been cumulative on these points. Because the defense has not shown how the requested documents were material to the impeachment of McKenney, and not merely cumulative, any error in failure to produce them is harmless. *See United States v. Dekle,* 768 F.2d 1257, 1263 (11th Cir.1985); *United States v. Barshov,* 733 F.2d 842, 849 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985).[3]

In summary, our review of the whole record and trial transcript has convinced us that there was no *Brady, Giglio,* or Jencks Act error in Valera's trial meriting reversal of defendant's conviction.

## II. *Question of Variance*

 Valera next contends that an impermissible variance exists between the crimes charged in the indictment and the evidence adduced at trial. He alleges that while the indictment charges a single RICO enterprise and a single RICO conspiracy, the evidence produced by the government at trial shows the existence of multiple independent enterprises and multiple independent conspiracies.

"[W]hether the evidence supports finding a single conspiracy is a question of fact for the jury." *United States v. Champion,* 813 F.2d 1154, 1165 (11th Cir.1987). We review the trial evidence in the light most

---

**3.** On appeal, Valera also contests the government's failure to disclose to the defense according to Fed.R.Crim.P. 16(c) certain airplane sale receipts and witness Martin's passport. The government argued to the trial court that defendant Valera was not made aware of these receipts during discovery because the documents first came into the government's possession on the eve of their use at trial and that Martin's passport could not be disclosed because it was not in the prosecution's possession, but in a sealed vault in the court's safekeeping.

In respect to these alleged discovery violations, appellant seemingly forgets 1) that his initial objection to the government's use of these airline receipts was withdrawn, so that Valera cannot now resurrect the argument on appeal; 2) that the district court, in any event, sustained the defense's objection to the receipts and the passport, refused to allow the government to admit them as evidence, and allowed the witnesses only to refresh their recollections by looking at these documents (McKenney, to refresh his memory as to the dates of his initial dealings with Valera; Martin, as to dates of his travels to Africa and Belize); and 3) that defense demurred to use of the passport to refresh Martin's memory only by stating that defense wished to view the document—defense then had that opportunity. The remedy of a discovery violation lies within the discretion of the trial court. *See United States v. Euceda-Hernandez,* 768 F.2d 1307, 1311–12 (11th Cir.1985). Even if the defense had not mooted the point by not maintaining a proper objection, we would still have to conclude that the district court's decision, limiting the government's use of the documents, was properly within the court's discretion.

favorable to the government to decide whether there is substantial evidence to support the jury verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942); *Champion,* 813 F.2d at 1166.

The indictment charges that the enterprise in this case, 18 U.S.C. sec. 1961(4), consisted of "a group of individuals associated in fact, made up of the defendants and others, which engaged in and the activities of which affected interstate commerce." The pattern of racketeering, 18 U.S.C. secs. 1961(1) and (5), "involv[ed] importation, receiving, concealment, buying, selling and otherwise dealing in narcotic or other dangerous drugs, bribery and obstruction of justice."

The government asserts that the evidence produced showed that defendant Valera and others associated to import drugs into the United States. Under the government's view, the enterprise existed to achieve financial gain through facilitating the entry of drugs into this country. While there were many ventures or individual conspiracies, there was also one enterprise, one common purpose, and one over-arching conspiracy.

Appellant Valera emphasizes the evidence that showed that Valera neither knew all the participants in other ventures nor was aware of the the existence of these other ventures. Appellant also emphasizes that the illegal activities began before Valera associated himself with the group and continued after the time he no longer dealt with the group. Based on these facts, appellant asserts that each venture involved a totally separate conspiracy and a separate enterprise (made up of the individuals participating in that specific importation).

We must reject appellant's view of the facts. The testimony of witness Joseph Crawford provided adequate support to the idea that but one enterprise and one over-arching RICO conspiracy existed and that Valera knowingly participated in the activities of this enterprise. Crawford testified that while there was no formally structured group, he knew that there were people upon whom he could depend to provide their services in various drug importation ventures as needed. Crawford readily accepted the analogy of the group or enterprise to a "pick-up" basketball game (an analogy suggested by defense counsel on cross-examination of the witness). The enterprise thus existed as an informal sort of business that sold its services to transport and to import drugs into this country.

Defendant Valera became a "customer" of the enterprise on several occasions, calling on the group to furnish their services to aid him in getting into America illegal drugs he had acquired or caused to be acquired elsewhere. "Mere 'customers' can indeed engage in a pattern of racketeering activity in furtherance of the affairs of the enterprise." *United States v. Manzella,* 782 F.2d 533, 538 (5th Cir.1986), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

Association, alone, with the enterprise is, of course, insufficient for violation of RICO: an individual must *agree* to participate in the affairs of the enterprise. While Valera may have been unaware of all the persons participating in other ventures and unaware of their source of drugs and their plans for distribution, there was evidence in trial testimony from which the jury could conclude that Valera was aware that others were using the enterprise—the informal group of McKenney and friends—to import drugs into the United States and that Valera agreed to participate in such activities by using the services of the group in his own ventures. " 'Agreement on an overall objective' can be proved by either an explicit agreement to participate in the enterprise or circumstantial evidence showing 'that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.' " *Id.* at 538–39 (citing *United States v. Sutherland,* 656 F.2d 1181, 1193 (5th Cir. Unit A Sept. 1981),[4] *cert. denied,* 455 U.S.

---

4. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent all decisions of the former Fifth Cir-

949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982)); *see also United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir.) ("A RICO conspiracy, like all conspiracies, does not require direct evidence of agreement; an agreement can be inferred from the circumstances."), *cert. denied*, — U.S. —, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986).

Under pre–RICO conspiracy principles, the government may well not have been able to show a single conspiracy under the circumstances of this case, because all conspirators did not agree to any particular predicate crime. Under the RICO Act, however, a series of agreements, which, pre–RICO, would constitute multiple conspiracies, can form, under RICO, a single "enterprise" conspiracy. *See United States v. Elliott*, 571 F.2d 880, 902–05 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Tillett*, 763 F.2d 628 (4th Cir.1985) (evidence sufficient to show a single, ongoing conspiracy, organized to profit from marijuana importation, rather than separate and distinct conspiracies, even where financiers changed during course of conspiracy).

Because the government presented sufficient evidence for a reasonable jury to find that Valera agreed to participate and did participate, through at least two predicate acts, in the single enterprise of importing drugs into America for profit, as charged in the indictment, appellant's argument on this point fails.[5]

### III. *Witness Immunity*

At trial, the defense wished to call Robert Williams as a witness in order to impeach the testimony of government witnesses McKenney and Crawford. At a hearing held outside the presence of the jury, Williams was called and refused to answer questions, claiming his fifth amendment privilege. Although Williams had received an informal grant of use immunity when he testified before a grand jury in July 1985, this grant of immunity and a plea agreement between Williams and the government were yet not finalized; thus the immunity did not apply to Williams' testimony in any other instances. The district court ruled that Williams would be considered a witness unavailable with reason. The district court therefore allowed the defense to read to the jury Williams' grand jury testimony to impeach witness McKenney.[6]

On appeal Valera contends that Williams should not have been allowed to claim the self-incrimination privilege because a) Williams already had valid immunity; b) the government had acted unfairly in not extending the immunity granted to Williams before the grand jury to Williams' testimony in Valera's case; c) the court did not determine that Williams' testimony at Valera's trial would be self-incriminating; and d) Williams had waived his immunity by making statements to Valera's attorney.

The record indicates that, at the time of Valera's trial, Williams had been given no grant of immunity in the Valera proceedings nor had he finalized his relationship with the government as a result of the 1985 agreement relating to his grand

---

cuit Court of Appeals decided prior to October 1, 1981.

**5.** Valera mistakenly relies on our opinion in *United States v. Castro*, 829 F.2d 1038 (11th Cir.1987), *opinion modified*, 837 F.2d 441 (11th Cir.1988), to support his position that trial evidence showed multiple offenses and conspiracies. There are, however, significant differences between Valera's case and Castro's. *Castro* was not a RICO case: defendants there were charged with a non–RICO general conspiracy. We determined that two conspiracies existed in that case because two very different goals and subject matters were involved and because the government adduced no evidence that Castro, involved in a conspiracy relating to certificates

of deposit, knew or should have known that action was being taken to falsify coffee inventories in order to obtain bank loans (the second conspiracy of the case).

In Valera's case, there is but one subject matter—drug importation—and one goal—profit through these importation ventures. Sufficient evidence was adduced through the testimony of co-conspirators to indicate that Valera knew or should have known that the enterprise was engaged in other drug importation ventures, similar to those in which Valera participated.

**6.** Williams had not been interrogated before the grand jury on the point that Valera wished to bring out regarding Crawford.

jury testimony. These facts dispose of Valera's first claim: Williams had no valid immunity at the time his testimony was requested. *See generally Pillsbury Co. v. Conboy,* 459 U.S. 248, 256–60, 103 S.Ct. 608, 614–15, 74 L.Ed.2d 430 (1983) (civil deposition testimony tracking prior immunized testimony is not, without duly authorized assurance of immunity at that time, statutorily immunized testimony and therefore cannot be compelled).

■ The record gives no indication of government abuse in the handling of the immunity process. While Williams' attorney indicated that he had been representing Williams in dealings with the government for three years and while Williams had testified before the grand jury approximately a year and a half before Valera's trial, there is no evidence that the government had deliberately delayed concluding its handling of Williams's case in order to deny Valera a defense witness in Valera's case. *See United States v. Sawyer,* 799 F.2d 1494, 1506–07 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987). "[D]istrict courts may not grant immunity to a defense witness merely because that witness possesses essential exculpatory information unavailable from other sources." *United States v. Gottesman,* 724 F.2d 1517, 1524 (11th Cir.1984).

■ In this case, the defense wished to question Williams about communications between himself and McKenney, who had already admitted his own involvement in drug smuggling. Williams' attorney was present at the hearing and opined that his client had an absolute fifth amendment privilege. From the record before it, the district court could properly have concluded that Williams' answers could incriminate him. Therefore, the district court correctly concluded that Williams had a right to invoke his self-incrimination privilege. *See United States v. D'Apice,* 664 F.2d 75, 77 (5th Cir. Unit B 1981).

Defendant's claim as to William's waiver of the self-incrimination privilege is patently frivolous. Defendant has therefore raised no meritorious ground for relief on the issue of witness immunity.

For the above reasons, defendant-appellant Valera's convictions and sentences are AFFIRMED.